924 So.2d 737 (2002)
Darryl D. TURNER
v.
STATE of Alabama.
CR-99-1568.
Court of Criminal Appeals of Alabama.
November 22, 2002.
Opinion on Return to Remand April 25, 2003.
Opinion on Return to Second Remand August 29, 2003.
Rehearing Denied October 24, 2003.
Certiorari Denied September 30, 2005.
*745 James Timothy Kyle, Decatur, for appellant.
William H. Pryor, Jr., atty. gen., and Beth Jackson Hughes, asst. atty. gen., for appellee.
Alabama Supreme Court 1030176.
WISE, Judge.
The appellant, Darryl D. Turner, was convicted of two counts of capital murder for murdering Barbara Wilson during the course of a rape and a robbery. See §§ 13A-5-40(a)(3) and 13A-5-40(a)(2), Ala. Code 1975. Turner was also convicted of robbery, theft, burglary, and rape. Turner waived his sentencing hearing before a jury. The trial court held a sentencing hearing and found four aggravating circumstances: that the murder was committed by a person who had previously been convicted of a felony involving the use of force; that the murder was committed during the course of a rape; that the murder was committed during the course of a robbery; and that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. The trial court then sentenced Turner to death.
The State's evidence tended to show that on February 21, 1996, Angela Anderson discovered the nude body of her mother, Barbara Wilson, in Wilson's home in Limestone County. The coroner testified that Wilson had been smothered to death. There was evidence that intercourse had occurred before the victim's death. Wilson's 1993 Cadillac automobile and a 19-inch Orion brand television were missing from her residence.
Anderson testified that on February 21, 1996, she took her two-year-old daughter, Rosalyn, to stay with her mother while she accompanied a sick friend to a local hospital. Later that same day Anderson attempted to locate her mother but was unsuccessful. She testified that she was not worried because she thought that her mother might have gone to Nashville to visit Wilson's brother, who was sick. *746 Anderson testified that the next morning when she was working she realized that her mother may have left her a note at her home. She left work and went back to her mother's house; as she approached the driveway Rosalyn ran out of the house saying that her grandmother was sleeping. Rosalyn led Anderson to her mother's dead body  Wilson was lying on a bed in one of the bedrooms in the house. Anderson telephoned emergency number 911.
At the time of Wilson's death she had been living with L.T. Southard. Greg Coleman, Turner's uncle and his roommate, was a coworker of Southard's at Stinnett Construction. Southard testified that on the day of Wilson's murder he had been called to a job in Birmingham and Coleman had accompanied him. The two were gone overnight. He identified the television and the Cadillac as belonging to Wilson.
Gail Reasonover, an employee of a pawnshop in Athens, Alabama, identified Turner as the individual who pawned a 19-inch Orion brand television on February 21, 1996. Reasonover testified that Turner said that he was pawning the television because he needed money for gasoline.
Police were able to locate Turner with the help of his mother. Turner was found in Louisville, Kentucky, hiding in a house, in a closet under a pile of clothes and blankets. Turner confessed to police that he was involved in Wilson's murder. He said that Trent Rainey and Chris Harris were his accomplices.[1] Turner confessed that the three men walked to Wilson's house and asked if they could use her telephone. He said that as he was walking to the telephone he heard a noise, looked around, and saw Harris standing over Wilson and Rainey "tying Wilson up." Turner said that he did not have sex with Wilson but that he saw Rainey and Harris on top of her. Turner told police that Harris held a pillow over Wilson's head because she was kicking and fighting.
Tavares McCurley, Chris Harris's cousin, testified that on February 21, 1996, Turner came by his house and asked him to go with him to "get a lick"  meaning, he said, to go rob someone. He declined. McCurley said that Turner then walked to the back of the house to talk with Chris Harris. He said that the two talked for about 20 minutes and that they left together. McCurley said that sometime later that same day Turner came back to his house and told him to look out the window. McCurley said when he looked out he saw Wilson's Cadillac parked in front of the house. McCurley testified that Turner told him that he had "killed the bitch." He told McCurley that he killed her because he did not want her to tell police what they had done.
Rodger Morrison of the Alabama Department of Forensic Sciences testified that he had conducted DNA testing on the vaginal swabs collected from the victim. He testified that in his opinion, he could exclude Harris, Rainey, or Southard as the source of the sperm, but that he could not exclude Turner.
The jury convicted Turner of two counts of capital murder and of robbery, theft, *747 burglary, and rape. After the jury returned its verdicts, Turner became highly emotional and began yelling obscenities in front of the jury. Turner met with his attorney and his family and waived his sentencing hearing before the jury.
The trial court held a separate sentencing hearing and sentenced Turner to death on the two capital-murder convictions. Turner was sentenced to concurrent terms of life imprisonment for his convictions for robbery, burglary, and rape; he was sentenced to 20 years' imprisonment for his theft conviction. Turner now appeals his convictions and sentences.

Standard of Review
Turner was sentenced to death; therefore, according to Rule 45A, Ala. R.App.P., this Court is charged with reviewing the trial court proceedings for plain error. Rule 45A, Ala.R.App.P., states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
"Plain error is `error that has or probably has adversely affected the substantial rights of the petitioner.' ... `[T]he plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Pace v. State, 714 So.2d 332, 335 (Ala.1997), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

Guilt-Phase Issues

I.
Turner argues that his Sixth Amendment right to a speedy trial was violated because of the unreasonable delay between his arrest and trial. He argues in brief that only one month of the 46-month delay can be attributed to him and that the record fails to disclose the reasons for the other delays.
When determining whether a defendant has been denied his constitutional right to a speedy trial an appellate court looks to the four factors articulated by the United States Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Those factors are: (1) the length of the delay, (2) the reasons for the delay, (3) defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant resulting from the delay.
Length of Delay. When calculating the length of the delay we measure the time from the date of arrest or indictment to the date of trial. "The right to a speedy trial is triggered when a criminal prosecution has begun." Ex parte Carrell, 565 So.2d 104, 107 (Ala.1990), cert. denied, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). To trigger an examination of the remaining factors in Barker v. Wingo, the length of the delay must be "presumptively prejudicial." Dority v. State, 586 So.2d 973, 975 (Ala.Crim.App.1991), citing Arnett v. State, 551 So.2d 1158 (Ala.Crim.App. 1989), and Wade v. State, 381 So.2d 1057 (Ala.Crim.App.1980). Turner was arrested in February 1996, indicted in March 1996, and tried in December 1999. There was a 46-month delay between Turner's arrest and his subsequent trial.
We have held the following delays between arrest and trial to be presumptively prejudicial: 60-month delay, see Ex parte Taylor, 720 So.2d 1054 (Ala.Crim.App. *748 1998); 56-month delay, see Wooden v. State, 822 So.2d 455 (Ala.Crim.App.2000); 42-month delay, see Benefield v. State, 726 So.2d 286 (Ala.Crim.App.1998); 26-month delay, see Mansel v. State, 716 So.2d 234 (Ala.Crim.App.1997); 29-month delay, see Howard v. State, 678 So.2d 302 (Ala.Crim. App.1996); and 31-month delay, see Vincent v. State, 607 So.2d 1290 (Ala.Crim. App.1992). Cf. Ex parte Apicella, 809 So.2d 865 (Ala.2001) (14-month delay not presumptively prejudicial).
Although, "the mere passage of time does not constitute a denial of a defendant's right to a speedy trial," Wooden, 822 So.2d at 457, a finding that the delay was presumptively prejudicial will necessitate the evaluation of the remaining factors in Barker v. Wingo. We note that the Barker court also stated that the complexity of the case has bearing on whether the length of the delay was reasonable. We conclude that the delay of 46 months in this case was presumptively prejudicial; therefore, we will evaluate the remaining factors in Barker.
Reasons for the Delay. After Turner was arraigned he filed over 30 motions. He moved that the indictment be dismissed because, he argued, Limestone County discriminated in the selection of the grand-jury forepersons. This motion was originally denied, and the case was set for trial in December 1997. Before the trial date, the case was continued upon agreement of all of the parties. In May 1998, Turner asked for a continuance so that he could have time to evaluate the DNA evidence and obtain his own DNA expert. (C.R. 186.) Although the trial court had initially denied the motion to dismiss the indictment, it granted Turner's motion for reconsideration and dismissed the 1996 indictment.
Turner was reindicted in June 1999. Turner moved for a continuance, stating as grounds that the new indictment added new charges and that he needed time to prepare his defense. (C.R. 191.) The trial court granted Turner's request for a continuance and Turner was tried in December 1999.
All of the delays appear to be based on motions filed by Turner.
Defendant's Assertion of Right. Turner failed to assert his constitutional right to a speedy trial. There is no motion for a speedy trial contained in the record. The United States Supreme Court in Barker v. Wingo noted that the "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." 407 U.S. at 532, 92 S.Ct. 2182.
"`Since there was no effort on the part of the appellant to secure his right to a speedy trial ... he may not complain of any delay on appeal.' Tidmore [v. City of Birmingham], 356 So.2d [231,] 233 [(Ala.Crim.App.1977)]. While a defendant who fails to demand a speedy trial does not forever waive his right, this is one factor which must be considered."
Bailey v. State, 375 So.2d 519, 523 (Ala. Crim.App.1979).
Prejudice to the Defendant. Turner's only argument in his brief to this Court concerning this prong of the Barker v. Wingo analysis is the following:
"The United States Supreme Court has identified three interests which are compromised: The interest in prevention of oppressive pretrial incarceration, the interest to minimize anxiety and concern of the accused, and the interest to limit the possibility that the defense will be impaired. All of these concerns were implicated by the unjustified 44 month [sic] delay in this case."
(Turner's brief to this Court, p. 55.) Turner's brief is totally devoid of any assertion *749 of how he was prejudiced by the delay. In fact the record reveals that Turner moved for several continuances so that he could better strengthen his defense.
After evaluating the factors in Barker v. Wingo, we conclude that Turner was not denied his constitutional right to a speedy trial.

II.
Turner argues that Limestone County's method of selecting grand jury-forepersons is racially discriminatory. Turner argues that he established a prima facie case of racial discrimination in the selection of the grand-jury forepersons because before 1998 only three blacks had been grand-jury forepersons.
Turner was first indicted in March 1996. The foreman of the 1996 Limestone County grand jury was white. Turner moved that the indictment in his case be dismissed because, he argued, the county discriminated in the selection of the grand-jury foreperson. This motion was ultimately granted, and in June 1999 Turner was reindicted. The foreperson of the June 1999 grand jury was black.
Turner argues that it does not matter whether the person chosen for the grand jury was a member of a discriminated race but only whether the factors in Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), have been satisfied. Those factors are whether (1) the group alleged to have been discriminated against is a cognizable group, (2) the group has been systematically excluded over a period of time, and (3) the system for selection is such that the process of selecting the grand-jury foreperson is subject to abuse.
Initially, we observe that there is no evidence in the record indicating that Turner objected to the second indictment returned against him. Because there was no objection we do not know the method used to select the grand-jury foreperson in June 1999. Accordingly, for Turner to prevail on this claim we would have to find plain error. We stated in Drinkard v. State, 777 So.2d 225, 242-43 (Ala.Crim.App.1998), rev'd, 777 So.2d 295 (Ala.), on remand, 777 So.2d 307 (Ala.Crim.App.2000):
"[T]he Alabama Supreme Court concluded that because of the role a grand jury foreperson plays in Alabama, any discrimination that occurs in the selection of a foreperson is not plain error, so long as the foreperson was chosen from a properly constituted grand jury. The Court, however, did not foreclose the possibility that a defendant could establish reversible error by a `timely and valid challenge to his or her indictment based on a violation of equal protection rights occurring as the result of discriminatory selection of the foreperson of the grand jury that returned the indictment.' Pace v. State, 714 So.2d [332,] at 338 [(Ala.1997)]. (Emphasis added.) The Court did not specify what would constitute a valid challenge to the indictment. Perhaps, as intimated by the Court, a defendant would have to establish that `the discriminatory selection of the foreperson ... impact[ed] the integrity of the indictment process through the composition of the grand jury panel,' or that `the discriminatory selection of the foreperson ... substantially impact[ed] the integrity of the indictment process through the involvement of the foreperson,' or `the discriminatory selection of the foreperson ... impact[ed] the integrity of the indictment process through the foreperson's influence over the grand jury panel.' Pace v. State, 714 So.2d at 337-38. Nevertheless, we do not believe that the appellant in this *750 case has made a valid challenge to the indictment."
777 So.2d at 242-43. Addressing this issue on certiorari review in Drinkard, the Alabama Supreme Court stated:
"[E]ven if we assumed that such discrimination did occur, we would hold, as the United States Supreme Court did in Hobby v. United States, 468 U.S. 339, 346, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984), that because of the ministerial function of grand-jury forepersons in Alabama, there is no invasion of ... `the distinctive interests of the defendant protected by the Due Process Clause.'"
Ex parte Drinkard, 777 So.2d 295, 304 (Ala.2000). For the reasons stated above, we find no plain error.

III.
Turner argues that he was subjected to vindictive prosecution when he was indicted for additional charges after he challenged his first indictment and after that indictment was ultimately dismissed.
In 1996 Turner was indicted in a four-count indictment for murder during the course of a robbery, and for robbery, burglary, and theft. The second indictment, issued in 1999, charged Turner in a six-count indictment with murder made capital because it was committed during the course of a rape, murder made capital because it was committed during the course of a robbery, and rape, robbery, burglary, and theft. Turner did not challenge his indictment on the basis that he was subjected to vindictive prosecution. Therefore, we would have to find plain error in order for Turner to prevail on this claim. Rule 45A, Ala.R.App.P.
In Hunt v. State, 642 So.2d 999 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994), we recognized the concept of vindictive prosecution. "`A prosecutor's use of the charging process may violate due process if it penalizes the exercise of constitutional or statutory rights.'" 642 So.2d at 1030, quoting Daniel F. McInnis et al., Project, Twenty-Second Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1991-1992, 81 Geo. L.J. 853, 1029-35 (1993).
In United States v. Goodwin, 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982), the United States Supreme Court addressed whether a defendant was subjected to vindictive prosecution after he initially expressed interest in pleading guilty but instead chose to go to trial on misdemeanor charges. The prosecutor then indicted the defendant for a felony charge arising out of the same incident. The United States Supreme Court found no presumption of prosecutorial vindictiveness in a pretrial setting. The Court stated:
"In Bordenkircher v. Hayes, 434 U.S. 357 [(1978)], the Court for the first time considered an allegation of vindictiveness that arose in a pretrial setting. In that case the Court held that the Due Process Clause of the Fourteenth Amendment did not prohibit a prosecutor from carrying out a threat, made during plea negotiations, to bring additional charges against an accused who refused to plead guilty to the offense with which he was originally charged. The prosecutor in that case had explicitly told the defendant that if he did not plead guilty and `save the court the inconvenience and necessity of a trial' he would return to the grand jury to obtain an additional charge that would significantly increase the defendant's potential punishment. The defendant refused to plead guilty and the prosecutor obtained the indictment. It was not disputed that the additional charge was justified by the evidence, that the prosecutor was in possession of this evidence at the time *751 the original indictment was obtained, and that the prosecutor sought the additional charge because of the accused's refusal to plead guilty to the original charge.
"In finding no due process violation, the Court in Bordenkircher considered the decisions in [North Carolina v.] Pearce, [395 U.S. 711 (1969)] and Blackledge [v. Perry, 417 U.S. 21 (1974)], and stated:
"`In those cases the Court was dealing with the State's unilateral imposition of a penalty upon a defendant who had chosen to exercise a legal right to attack his original conviction  a situation "very different from the give-and-take negotiation common in plea bargaining between the prosecution and defense, which arguably possess relatively equal bargaining power." Parker v. North Carolina, 397 U.S. 790, 809 (opinion of Brennan, J.).' 434 U.S., at 362.
"....
"This case, like Bordenkircher, arises from a pretrial decision to modify the charges against the defendant. Unlike Bordenkircher, however, there is no evidence in this case that could give rise to a claim of actual vindictiveness; the prosecutor never suggested that the charge was brought to influence the respondent's conduct. The conviction in this case may be reversed only if a presumption of vindictiveness  applicable in all cases  is warranted.
"There is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting. In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized. In contrast, once a trial begins  and certainly by the time a conviction has been obtained  it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.
"In addition, a defendant before trial is expected to invoke procedural rights that inevitably impose some `burden' on the prosecutor. Defense counsel routinely file pretrial motions to suppress evidence; to challenge the sufficiency and form of an indictment; to plead an affirmative defense; to request psychiatric services; to obtain access to government files; to be tried by jury. It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter. The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates.
"Thus, the timing of the prosecutor's action in this case suggests that a presumption of vindictiveness is not warranted. A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct. As we made clear in Bordenkircher, the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution." *752 457 U.S. at 377-82, 102 S.Ct. 2485 (footnotes omitted).
Here, the only evidence offered by the defendant to show that he was subjected to vindictive prosecution is the fact that new charges where brought against Turner after he filed a motion to dismiss the first indictment. Because this issue was not presented to the trial court, we do not know why the prosecutor chose to reindict Turner for additional charges. However, our review of the record reflects that the prosecutor who obtained the first indictment was subsequently appointed to a judgeship, and a new prosecutor was appointed to fill the vacancy. The new prosecutor obtained the second indictment against Turner. It also appears that the new charges were brought after the DNA tests on the semen recovered from the victim were completed. As was the case in Goodwin, Turner has failed to assert any evidence to show that the new charges were brought in retaliation for his moving to dismiss the first indictment. This claim must fail for the reasons detailed by the United States Supreme Court in Goodwin.

IV.
Turner argues that he was denied his right to have a jury chosen by a fair cross-section of the community because, he argues, the trial court excused potential jurors based on grounds insufficient to remove a prospective juror under § 12-16-63, Ala.Code 1975. He specifically argues that the trial court erred in excusing from jury service potential jurors J.D. and P.S.
Section 12-16-63, Ala.Code 1975, provides:
"(a) The court, upon request of a prospective juror or on its own initiative, shall determine on the basis of information provided on the juror qualification form or interview with the prospective juror or other competent evidence whether the prospective juror should be excused from jury service. The jury commission shall enter this determination on the juror qualification form and the master list.
"(b) A person who is not disqualified for jury service may be excused from jury service by the court only upon a showing of undue hardship, extreme inconvenience or public necessity, for a period the court deems necessary, at the conclusion of which the person may be directed to reappear for jury service in accordance with the court's direction."
Interpreting the scope of § 12-16-63, Ala.Code 1975, this Court has stated:
"A trial judge has `broad discretion' in excusing venire members based on sickness or personal reasons, Nolen v. State, 35 Ala.App. 249, 253, 45 So.2d 786, 790, cert. denied, 253 Ala. 565, 45 So.2d 792 (1950), but that decision must not be `capricious or arbitrary.' Blackmon v. State, 246 Ala. 675, 679, 22 So.2d 29, 31 (1945). `It is generally held, however, that the court, in the exercise of sound discretion, may excuse a juror before he is sworn for any reason personal to such person which would make his service as a juror oppressive, or in fact for any reason which to the judge seems sufficient.' 47 Am.Jur.2d Jury § 121 (1969) (footnotes omitted). `There is nothing in the insistence that it is not within the legal power of the court to excuse a juror for a cause regarded as sufficient by the court.' Evans v. State, 209 Ala. 563, 565, 96 So. 923, 924 (1923). `[O]f necessity, great discretionary power in the selection of jurors to try cases must rest with the trial judge, and appellate courts will not interfere with this discretion, so long as no abuse of power is shown.' Baxley v. State, 18 Ala.App. 277, 90 So. 434, 435, cert. denied, 206 Ala. 698, 90 So. 925 (1921)."
*753 McNair v. State, 653 So.2d 320, 325 (Ala. Crim.App.1992), aff'd, 653 So.2d 353 (Ala. 1994).
The record reflects that prospective juror P.S. was excused because he indicated that he had a nervous condition that prevented him from sitting for long periods and that he wanted to be excused from jury service. Prospective juror J.D. notified the court that he was a diabetic and that he was taking insulin for his diabetes and that he needed to eat at regular intervals. He also stated that if the court could accommodate his medical needs he believed that he could serve on jury duty. However, sometime later J.D. approached the trial court and asked to be excused because he did not think he was able to serve, given his medical condition. Both of these jurors were removed from service without any objection by defense counsel.[2] There is absolutely no indication that the trial judge abused his discretion in removing these prospective jurors pursuant to the authority granted him by § 12-16-63, Ala.Code 1975.

V.
Turner next argues that the trial court erred in excusing several prospective jurors, M.P. and M.L., for cause who, he says, were rehabilitated after they initially indicated that they were opposed to capital punishment. Turner argues that the trial court, by granting the State's challenges for cause, violated his constitutional rights to due process, an impartial jury, a fair trial, and a reliable sentencing determination.
"`[W]hether a prospective juror in a capital murder case is properly excluded based on the juror's views concerning the death penalty involves a question of fact. Therefore, a proper review of this determination requires that we give great deference to the trial judge's discretion, because the judge was present and capable of observing the potential jurors and their responses.' Price v. State, 725 So.2d 1003, 1025 (Ala.Cr.App. 1997), aff'd, 725 So.2d 1063 (Ala.1998), citing Wainwright v. Witt, [469 U.S. 412 (1985)].
"In Clemons v. State, 720 So.2d 961 (Ala.Cr.App.1996), aff'd, 720 So.2d 985 (Ala.1998), this court stated:
"`"Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), set the early standard for a court's exclusion for cause of venire-persons who oppose the death penalty. The Court in dicta in Witherspoon limited exclusion for cause to those venirepersons who made it `unmistakably clear (1) that they would automatically vote against imposition of capital punishment ... or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.' Id. 522-23 n. 21, 88 S.Ct. at 1777 n. 21. Subsequently, in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court clarified or modified its decision in Witherspoon by holding that the state may exclude venirepersons in capital cases whose views would "`prevent or substantially impair the performance of [their] duties as a juror in accordance with his instruction and [their] oath."' Id., 469 U.S. at 424, 105 S.Ct. at 852 (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The new Witt standard dispensed with *754 the Witherspoon reference to `automatic' decision-making, and eliminated the requirement that a venireperson's bias be proved with `unmistakable clarity.' 469 U.S. at 424, 105 S.Ct. at 852."'"
Burgess v. State, 811 So.2d 557, 570 (Ala. Crim.App.1998), aff'd in relevant part, 811 So.2d 617 (Ala.2000).
The record reflects that prospective juror M.P. was excused for cause on the State's motion. M.P. indicated during the initial questioning that she would always vote for life imprisonment without the possibility of parole. The trial court then allowed the jurors who had indicated that they were opposed to the death penalty to be questioned. As part of that questioning, the following exchange took place:
"[Prosecutor]: [M.P.] you've had plenty of time to think about it. Could you tell me if you could follow the instructions of the Judge?
"[M.P.]: I want people to know that I'm opposed to the death penalty because I believe life and death [are] in God's hands. I could consider it if I were instructed to do so.
"[Prosecutor]: So if the Judge tells you it's your duty to do so as a citizen and as a juror, you could follow the instruction?
"[M.P.]: I would try to, yes."
(R. 197.) A trial judge is in a decidedly better position than an appellate court to assess the credibility of the jurors during voir dire questioning. See Ford v. State, 628 So.2d 1068 (Ala.Crim.App.1993). For that reason, we give great deference to a trial judge's ruling on challenges for cause. Baker v. State, 906 So.2d 210 (Ala.Crim. App.2001).
M.P. never unequivocally stated that she could disregard her views concerning the death penalty and follow the court's instructions. However, the overwhelming number of questions M.P. answered indicated that she was opposed to the death penalty. The trial court's ruling excluding this juror for cause is supported by the record.
Turner also challenges the trial court's removal of prospective juror M.L. This juror also indicated that he would always vote for life imprisonment without parole and that he was opposed to the death penalty. When questioned about his views, M.L. stated:
"[Prosecutor]: Even though you say you are against the death penalty, if the Judge tells you that you must consider both sentences, you must consider life without parole and the death penalty, could you put aside your belief?
"[M.L.]: No.
"....
"[M.L.]: You are asking us to put aside our beliefs? No way.
"[Prosecutor]: Who said that?
"[M.L.]: [M.L.] I said that."
(R. 176.) Later when questioned by defense counsel M.L. stated:
"[Defense counsel]: All right. [M.L.], I will ask you the same sort of questions. I understand you are totally opposed to the death penalty. Are you opposed to being part of implementing it or 
"[M.L.]: Yes. If it's boiling down to a jury of 12 people  thou shalt not kill. If it's 12 people that are  like, don't believe in that, then I don't want any part of that because I believe that everybody should have a second chance, even if it is in jail forever. There is still, like, time to think about the source that makes our heart beat. That's completely where I'm at.
"[Defense counsel]: Let me ask you this, [M.L.], if the Judge tells you that the law requires you to consider the death *755 penalty, can you follow his instructions and give it due consideration?
"[M.L.]: Explain.
"[Defense counsel]: In other words, if you sit on this jury and you find my client guilty of capital murder, the Judge will give you some instruction. He will say that the law says this and this and this about capital punishment. He will tell you that you must consider either voting for the death penalty or voting for life without parole. The one option is that my client die in the electric chair. The other option is that he be placed in prison for life without the opportunity to be paroled. It's not a life sentence where he can get out. There is no possibility of ever getting out. Would you be able to consider both of those alternatives and vote for the one you think the law requires you to go for?
"[M.L.]: I could consider it and vote for what I believe in.
"[Defense counsel]: I'm asking you, could you vote for what you think would be the appropriate verdict given what the Judge's instructions are?
"[M.L.]: Yes."
(R. 190-91.) As this Court stated in Thomas v. State, 539 So.2d 375, 389 (Ala. Crim.App.), aff'd, 539 So.2d 399 (Ala.1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989), quoting Patton v. Yount, 467 U.S. 1025, 1039-40, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984):
"`The testimony of each of the three challenged jurors is ambiguous and at times contradictory. This is not unusual on voir dire examination, particularly in a highly publicized criminal case. It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading.'"
After reading the transcript of the voir dire examination, we conclude that the trial court could have logically determined that the challenged jurors expressed views that would substantially impair their ability to render an impartial verdict. The trial court committed no error in granting the State's challenges for cause.

VI.
Turner argues that the prosecutor violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, Turner argues that the prosecutor erred in removing prospective juror C.H. He further argues that the trial court erred in finding that Turner failed to present a prima facie case of discrimination when he challenged the prosecutor's removal of an Hispanic prospective juror.
"The party alleging a Batson violation has the burden of establishing a prima facie case of discrimination. It is only when a prima facie case of discrimination has been established that the challenged party must explain its reasons for removing the designated jurors." Tomlin v. State, 909 So.2d 213, 241 (Ala.Crim.App. 2002).
*756 The record reflects that after the jury was struck Turner made the following objection:
"[Defense counsel]: Judge, we would object to the State striking [C.H.], who is your number thirty-one."
(R. 347.) The record indicates that C.H. was a black female.
The trial court then asked for the State's response to the objection and the prosecutor stated its reasons for striking this juror from the venire. The prosecutor offered its reason before the trial court ruled on whether Turner had established a prima facie case of discrimination. However, because the reason is contained in the record we will evaluate the reason to see if it is race neutral. See Hall v. State, 820 So.2d 113 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001).
The prosecutor stated that he removed C.H. because she indicated during voir dire that she was opposed to the death penalty. This is a race-neutral reason for removing C.H. See Smith v. State, 797 So.2d 503 (Ala.Crim.App.2000).
The following then occurred:
"[Defense counsel]: Judge, our other challenge would be to  although as I understand it will remain on as an alternate, I believe, juror number forty, who is obviously of Hispanic origin.
"The Court: Okay.
"[Defense counsel]: I don't recall him  I may be incorrect  I don't recall him answering a single question on voir dire, and I don't know the reason that the State could have for wanting to strike him. Unless I'm mistaken, he didn't answer any questions other than telling us who he was. We feel that there could be a good many more articulate reasons for striking him other than appearance or something of that nature, and we challenge that.
"[Prosecutor]: Your Honor, I'll say that that doesn't rise to the level of a Batson challenge. However, I would say that to begin with I wasn't aware of [W.L.'s] being Hispanic. From looking at his name in light of him not answering any questions I would assume he was of Italian descent. I didn't know what his origin was. There were several people that did not answer that we struck for reasons known only to the State. I was not aware of his ethnic background.
"The Court: I think the concern I've got is whether or not it rises to a prima facie  that would justify her, you know, articulating any specifics. I feel like in this case if it's a black, I feel like to me, I'm going to require some justification, but [W.L.], what type nationality or what he is, I mean  I don't know. How he appears to us and what we would assume from that that he's a descendent of whoever  I just don't see it. I'm going to deny it. I don't think it's a valid objection."
(R. 350-51.)
The record fails to disclose the race or gender of the prospective jurors. We do not know if W.L. was Hispanic or if he was the only Hispanic on the venire.[3] However, assuming that the record does support Turner's assertions we would find that the trial court correctly held that defense counsel failed to present a prima facie case of discrimination. As this Court recently stated in Smith v. State, 838 So.2d 413, 466 (Ala.Crim.App.2002) (opinion on return to remand):

*757 "[B]ecause the appellant's Batson motion concerning the striking of the one Hispanic potential juror was based solely on the fact that he was asked no question by the prosecutor, the appellant failed to establish a prima facie case, as this Court has held that such facts alone do not create a sufficient inference of discrimination. Edwards v. State, 628 So.2d 1021, 1024 (Ala.Crim. App.1993)."

VII.
Turner next argues that his arrest was illegal and that, therefore, his subsequent statement was due to be suppressed because it was the fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Turner argues that he was unlawfully arrested in his home without a warrant and without exigent circumstances or consent. He cites Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), in support of this contention that his arrest was unlawful.
At trial Turner did not challenge his arrest or his subsequent statement to police. Therefore, we are limited to determining whether there was plain error. Rule 45A, Ala.R.App.P.
The circumstances surrounding Turner's arrest are not developed in the record because Turner did not object. We have only the testimony of one police officer concerning the sketchy details surrounding Turner's arrest. Heath Emerson, a former detective with the Athens Police Department, testified that he was instructed in February 1996 to travel to Louisville, Kentucky, to transport Turner back to Alabama. After he arrived in Louisville, Turner's mother telephoned the police station and told police where her son could be located. Emerson said that he and Officers of the Louisville Police Department approached the house  a location known to police officers  and he saw Turner peeking out of one of the windows. Emerson said that police entered the house and discovered Turner in a back bedroom under a pile of clothes and blankets. Turner was then transported to the Louisville Police Department where he was read his Miranda[4] rights and questioned about Wilson's murder. These are the only facts contained in the record. We do not know if the police had a warrant, who owned the house that Turner was apprehended in, or the circumstances surrounding the entry into the house.
As this Court stated in an appeal in Smith v. State, 588 So.2d 561 (Ala.Crim. App.1991), a capital case:
"No challenge was made at trial to the search of the appellant's house or to his arrest; thus, there is no suggestion of illegality as to these matters in the record. Cf. Ex parte Watkins, 509 So.2d 1074, 1076-77 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987) (wherein the Court, addressing a claim made pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which had been neither raised nor preserved in the record, wrote, `The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which the error is predicated ever occurred'); White v. State, 587 So.2d 1218 (Ala.Cr.App.1990), affirmed, 587 So.2d 1236 (Ala.1991) (wherein this court held that an appellant could not raise a claim pursuant to Batson v. Kentucky, supra, where `[t]he record does not even raise the inference of unconstitutional jury selection')."
588 So.2d at 577.
As stated above, Turner cites Payton v. New York in support of his *758 argument that his arrest was illegal. The Payton court held that police could not enter a house to make a routine felony arrest without a warrant or consent. "`"The consent necessary in Payton context is consent to enter, not consent to arrest."'" Freeman v. State, 776 So.2d 160, 178 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.), cert. denied, 531 U.S. 966, 121 S.Ct. 400, 148 L.Ed.2d 308 (2000), quoting Fortenberry v. State, 545 So.2d 129, 137 (Ala.Crim.App.1988), aff'd, 545 So.2d 145 (Ala.1989). No facts appear in the record concerning how the police obtained entry to the house in which Turner was apprehended. Turner states in his brief that it was his house; however, there is absolutely no support in the record for this statement. In fact, there is support for the contrary. Turner's mother had to telephone police with his location before he was apprehended. It did not appear that Turner had any known address in Louisville.
Based on the scant record before this Court concerning Turner's arrest, we are unable to find any plain error.

VIII.
Turner further argues that the trial court erroneously admitted his confession without first determining that it was voluntary.
Turner failed to object to the introduction of his statement; therefore, we do not have the fully developed testimony that would have occurred at a suppression hearing had Turner objected. We are limited to a plain-error analysis. Rule 45A, Ala.R.App.P.
The record reflects that after he was arrested Turner was taken to the Louisville Police Department. Emerson testified that Turner was read his Miranda rights before he was questioned and that he signed a waiver-of-rights form. The waiver was admitted into the record. He said that Turner was not offered or promised anything in order to obtain his confession. Neither was he threatened. When asked how Turner appeared when he was questioned, defense counsel objected stating that "We've got a videotape, and the tape will speak for itself." (R. 511.) During defense counsel's cross-examination of Emerson, a videotape of the statement Turner made to police was introduced and admitted into evidence. Emerson also stated on cross-examination, "I told Mr. Turner that all I could do was tell the Judge that he cooperated by giving a statement." (R. 523.)
It appears that Turner not only failed to object to the introduction of his statement but, in fact, introduced the contents of the statement through the introduction of the videotape. (R. 529.)
The State has the burden of proving by a preponderance of the evidence that a statement is voluntary. To satisfy this burden the State must present evidence that Miranda warnings were given and that the statement was voluntary or that it was not procured by inducement or coercion. See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). In determining whether a statement is voluntary we must look at the totality of the circumstances. See Ex parte Gaddy, 698 So.2d 1150 (Ala.1997), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997).
The Alabama Supreme Court in McLeod v. State, 718 So.2d 727 (Ala.1998), granted certiorari review to determine if a defendant's statement to police, made after police had indicated that they would make his cooperation known, rendered the statement involuntary. The McLeod Court, *759 holding that the statement was voluntary, stated:
"[T]he test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by `apprehension of harm or hope of favor.' See [Ex parte] Gaddy, 698 So.2d [1150] at 1154 [ (Ala.1997) ] (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala.1988)); Culombe [v. Connecticut,] 367 U.S. [568] at 602, 81 S.Ct. at 1879 [(1961)]; Jackson [v. State], 562 So.2d [1373] at 1380 [(Ala.Crim.App. 1990)]. To determine if a defendant's will has been overborne, we must assess `the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; `[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.' Jackson, 562 So.2d at 1380-81 (citations omitted)."
718 So.2d at 730.
We have reviewed the videotape of Turner's statement. Absolutely nothing in the tape suggests that Turner was physically or psychologically pressured in order to obtain his statement. The questioning lasted for approximately three hours. There is no indication in the record that Turner was deprived of food, sleep, or restroom facilities during questioning. Neither does the tape reflect that Turner was under the influence of alcohol or drugs when he confessed to police. The record reflects that Turner was not a novice to contact with police. Turner had previously been convicted of assault in the second degree and had also been arrested for possession of marijuana and resisting arrest.
Given the totality of the circumstances, we cannot say that Turner's confession was involuntary. The trial court committed no plain error in allowing Turner's statement to be introduced into evidence.

IX.
Turner argues that the trial court erred in admitting into evidence photographs that he says prejudiced the jury against him and inflamed the jury. He asserts that the photographs were cumulative of the videotape of the crime scene that had already been admitted, that they had no probative value, and that the trial court abused its discretion in allowing the photographs to be admitted into evidence.
We have reviewed the photographs challenged by Turner; the trial court did not err in allowing them to be received into evidence.
"`Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into *760 evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App.1984).'"
Travis v. State, 776 So.2d 819, 869 (Ala. Crim.App.1997), aff'd, 776 So.2d 874 (Ala. 2000), quoting Ex parte Siebert, 555 So.2d 780, 783 (Ala.1989).
The photographs were correctly received into evidence pursuant to this Court's holding in Travis.

X.
Turner argues that the trial court erred in allowing evidence of prior bad acts to be received into evidence without the trial court sua sponte giving a limiting instruction. He contends that according to the Supreme Court's holding in Ex parte Minor, 780 So.2d 796 (Ala.), on remand, 780 So.2d 804 (Ala.Crim.App.2000), he is entitled to a new trial.
The following occurred during the direct examination of former police detective Heath Emerson:
"[Prosecutor]: Did Lt. Harrison give you a specific place to go where you would find Darryl Turner?
"[Emerson]: Initially, when I arrived in Louisville, I called a phone number that Mr. Turner said he would be at. A black male answered the phone and identified himself as Willie. I asked if Darryl was there, and he said, no. I asked if he was Darryl, and he said, no, and hung up the telephone.
"[Prosecutor]: So you didn't locate him there?
"[Emerson]: No.
"[Prosecutor]: And then what did you do?
"[Emerson]: I realized that we were going to have a hard time locating Mr. Turner so I enlisted the help of the Louisville Police Department. I went to the Fourth Precinct and met up with a lieutenant there and advised him of the situation and that I was looking for Darryl Turner. They checked their active warrant file and had outstanding warrants on Mr. Turner for some unrelated charges. I also had some photographs of Mr. Turner. He began using their resources to try to locate Mr. Turner. During that time I received a call from the Department. I think it was from Mr. Turner's mother."
(R. 508-09) (emphasis added). Turner contends that the above highlighted comment from Emerson was sufficient to warrant a new trial pursuant to the Supreme Court's holding in Minor.
The Alabama Supreme Court in Minor held that the trial court's failure to instruct sua sponte a jury on the limited use of evidence of prior convictions was plain error because it substantially prejudiced the defendant. In Minor, the defendant testified and was subjected to an extensive cross-examination. The prosecutor elicited testimony on cross-examination that Minor had previously been convicted of assault, possession of cocaine, and rape, and that he had escaped from jail while awaiting trial on capital charges. No objection was made to this testimony and no request was made for the trial court to give the jury a limiting instruction to the effect that the evidence was not admissible as substantive evidence of Minor's guilt. Finding plain error in the trial court's *761 failure to sua sponte give a limiting instruction the Alabama Supreme Court stated:
"[T]his Court has acknowledged the inherently prejudicial nature of evidence of a defendant's prior convictions. Cofer v. State, 440 So.2d 1121, 1124 (Ala.1983) (`[e]vidence of prior bad acts of a criminal defendant is presumptively prejudicial to the defendant'). `The general exclusionary rule bars the state from introducing evidence of an accused's prior criminal acts for the sole purpose of proving the propensity of the accused to commit the charged offense.' Hobbs v. State, 669 So.2d 1030, 1032 (Ala.Crim. App.1995). Thus, evidence of prior convictions is admissible only for limited purposes. `The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.' Cofer, 440 So.2d at 1123 (quoting Charles W. Gamble, McElroy's Alabama Evidence § 69.01 (3d ed.1977)). The general exclusionary rule `protects the defendant's right to a fair trial' by seeking "`to prevent conviction based on a jury belief that [the] accused is a person of bad character. The jury's determination of guilt or innocence should be based on evidence relevant to the crime charged.'" Cofer, 440 So.2d at 1123 (citation omitted). Thus, it naturally follows that the trial court should take all necessary precautions to ensure that when evidence of a defendant's prior convictions is admitted into evidence, the jury is properly instructed on the purpose for which it may consider that evidence. This includes instructing the jury, sua sponte, that it may not consider the evidence of prior convictions as substantive evidence that the defendant committed the charged offense."
780 So.2d at 802.
More recently in Snyder v. State, 893 So.2d 482 (Ala.2001), the Supreme Court limited its earlier holding in Minor. The Snyder Court stated:
"This Court, in finding that plain error had occurred in Ex parte Minor, recognized that Minor's testimony was extremely damaging, that the need for an instruction limiting the use of the evidence was obvious, and that the failure to give the instruction was so prejudicial that it affected Minor's substantial rights. While the Court found plain error in the trial court's failure to instruct the jury on the purpose of the evidence of Minor's prior conviction, the Court's holding in that regard did not establish a per se rule. See United States v. Waldrip, 981 F.2d 799 (5th Cir.1993) (clarifying United States v. Diaz, 585 F.2d 116 (5th Cir.1978), and holding that whether a failure to instruct on the limited use of prior-conviction evidence was error was to be determined on a case-by-case basis). Thus, each inquiry regarding the propriety of an instruction on the use of evidence of prior convictions presented for impeachment purposes must be determined on a case-by-case basis."
893 So.2d at 485.
Initially, we note that there was no objection to the introduction of Emerson's above-referenced testimony. Therefore, we are limited to a plain-error review. Rule 45A, Ala.R.App.P.
This case is not controlled by Minor or Snyder. There was no cross-examination of the defendant concerning any prior convictions. Neither was there any reference that Turner had previously been convicted of any crime. An outstanding warrant does not equate to a conviction. In this *762 case there was only a brief reference  one that was not elicited by the prosecutor  that Turner had some outstanding warrants. As the State correctly points out in brief, this reference could have meant that Turner had outstanding warrants for traffic violations. Moreover, this was the only reference to this evidence in the record. This case is distinguishable from Minor and Snyder.
Moreover, assuming for the sake of argument that the evidence constituted evidence of a prior conviction, we would find no reversible error. As we recently stated in Hocker v. State, 840 So.2d 197, 215 (Ala.Crim.App.2002):
"[W]e note that the trial court did not instruct the jury about the proper use of the evidence about the appellant's collateral bad act. However, the appellant did not request such an instruction. Also, the evidence about the prior bad act was not emphasized during either the presentation of evidence or arguments. Further, there was much direct and circumstantial evidence as to the appellant's guilt. In fact, the evidence against the appellant was strong and compelling. Therefore, under the specific facts of this case, we do not find any plain error in this regard. Compare Snyder v. State, 893 So.2d 482 (Ala. 2001)."
There was no plain error in the trial court's failure to give sua sponte the jury a limiting instruction on the use of the testimony that Emerson volunteered.

XI.
Turner argues that the trial court erred in allowing deoxyribonucleic acid ("DNA") evidence obtained from tests conducted on the sperm collected from vaginal swabs of the victim to be received into evidence. He asserts that the State failed to meet the requirements of Turner v. State, 746 So.2d 355 (Ala.), on remand, 746 So.2d 363 (Ala.Crim.App.1998), because, he says, no population-frequency statistical information was introduced.[5] Turner argues that the absence of this information resulted in the jury's having no guidance as to how to apply the DNA evidence.
The Alabama Supreme Court in Turner stated:
"We hold that if the admissibility of DNA evidence is contested, the trial court must hold a hearing, outside the presence of the jury, and, pursuant to § 36-18-30 [Ala.Code 1975] determine whether the proponent of the evidence sufficiently establishes affirmative answers to these two questions:
"I. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA forensic evidence is based `reliable'?
"II. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA evidence is based `relevant' to understanding the evidence or to determining a fact in issue?
"Trial courts should use the flexible Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993),] analysis in making the `reliability' (scientific validity) assessment. In making that assessment, the courts should employ the following factors: (1) testing; (2) peer review; (3) rate of error; and (4) general acceptance.
"Trial courts should make the `relevance' assessment by addressing the `fit' between what the scientific theory and *763 technique are supposed to show and what must be shown to resolve the factual dispute at trial. Whether otherwise reliable testing procedures were performed without error in a particular case goes to the weight of the evidence, not its admissibility. Only if a party challenges the performance of a reliable and relevant technique and shows that the performance was so particularly and critically deficient that it undermined the reliability of the technique, will evidence that is otherwise reliable and relevant be deemed inadmissible.
"Of course, once a particular theory or technique has satisfied § 36-18-30, a court may take judicial notice of that theory or technique's reliability. See [Ex parte] Perry, 586 So.2d [242] at 251 [(Ala.1991)]; [United States v.] Beasley, 102 F.3d [1440] at 1448 [(8th Cir.1996)] (holding that reliability of the polymerase chain reaction (`PCR') method of DNA typing would be subject to judicial notice in future cases); [United States v.] Martinez, 3 F.3d [1191] at 1197 [(8th Cir.1993)] (holding that the reliability of the restriction fragment length polymorphism (`RFLP') procedure was subject to judicial notice). We recognize that the state of scientific theories and the techniques for producing DNA evidence is not static, and that the scientific community undoubtedly will produce new theories and techniques regarding DNA. Each new theory and technique will be subject to the test set out above until its reliability warrants judicial notice."
746 So.2d at 361-62 (footnotes omitted).
Before the admission of the DNA evidence defense counsel moved for the trial court to hold a hearing outside the presence of the jury to determine the admissibility of this evidence. Roger Morrison, a laboratory director for the Alabama Department of Forensic Sciences, testified that he performed the DNA tests on the blood found on a knife and on samples from vaginal swabs taken from the victim. Morrison testified that he used the PCR method[6] to analyze the samples in this case. He testified extensively about their reliability and about the quality controls used to maintain the integrity of the samples. Morrison provided in-depth testimony about the procedures performed on the samples in this case. He stated that he first attempted to separate the DNA from the sperm cells from the DNA from the vaginal cells. The next step was quantitation or determining how much human DNA was in the sample. The DNA was then amplified  a process Morrison referred to as "molecular Xeroxing." To ensure that this process is accurate a "product gel" was performed  a gel was spread on the sample to ensure the appropriate reaction. Then the actual typing of the sample was done and certain genetic markers were identified. Morrison testified that it was his opinion, after performing the tests, that the blood on the knife was the victim's.[7] He further testified that he could not exclude Turner as the source of the sperm but he could exclude Turner's two codefendants and the victim's boyfriend. Dr. Morrison did not testify as to any population-frequency statistics on the *764 sperm collected from the vaginal swab.[8] He testified that population-frequency statistics were not routinely performed on mixed samples.[9] After being questioned by Turner's counsel, Dr. Morrison testified that he could provide population-frequency statistics.[10]
Turner then called his own DNA expert to testify at the hearing. Dr. Lee Ann Harmon, associate director of the Immunogenetics DNA Diagnostics Laboratory at the University of Alabama in Birmingham, testified:
"[Dr. Harmon]: I've reviewed the procedures manual as well as the laboratory chain of custody on the items that were tested in this case. I've looked at the genetic typing. This morning I looked at the actual typing results of the report that was made for this DNA analysis. I've looked at numerous supporting documents as to how the samples were handled in the laboratory and how they were tested, and the amount of DNA that was used, and the laboratory work that was done on the samples.
"[Defense counsel]: Dr. Harmon, you are not here to say at all that any mistake was made by the laboratory; is that correct?
"[Dr. Harmon]: Correct."
(R. 567-68.) Dr. Harmon further testified that the accepted guidelines for DNA testing recommend that no population-frequency statistics be calculated for mixed samples. She further testified that because the sample was a mixed sample there was no way you could positively say that Turner was the contributor of the sperm. However, Dr. Harmon did testify that "as Mr. Morrison testified, [Turner] certainly is a possible contributor." (R. 574.)
On appeal Turner argues that the trial court erred in allowing the DNA evidence to be presented without population-frequency statistical information to accompany the evidence. He asserts that the absence of this information rendered the DNA identification evidence meaningless. In his brief to this Court, Turner cites cases from other states where courts have excluded DNA evidence that was not accompanied by population-frequency statistical information. See Hull v. State, 687 So.2d 708 (Miss.1997) (DNA evidence was not admissible without population-frequency statistics); State v. Cauthron, 120 Wash.2d 879, 846 P.2d 502 (1993) (testimony that the defendant was a "match" was not admissible without evidence of population-frequency statistics); State v. Vandebogart, 136 N.H. 365, 616 A.2d 483 (1992) (population-frequency calculations had not gained sufficient acceptance in genetics and were not admissible). However, no case cited by Turner specifically addresses the admission of population-frequency statistics for a mixed sample.
Here, both the State and the defense's expert witness agreed that statistical information was not usually calculated on mixed samples. Defense counsel's expert also testified that the guidelines provide that population-frequency statistical information not be performed on mixed samples. (R. 572-73.)
Alabama has never specifically addressed whether population-frequency statistical *765 information for mixed samples should be admitted. Our research has revealed very few courts that have specifically addressed this issue. However, the Supreme Court of Mississippi in Watts v. State, 733 So.2d 214 (Miss.1999), addressed this issue; we believe its reasoning is sound. The Mississippi Court stated:
"Watts asserts that [the] circuit court erred in overruling his motion to strike the State's PCR evidence regarding stains found on the inside of his undershorts. At trial, evidence was presented that the undershorts Watts was wearing when he was taken in for questioning contained a mixture of DNA evidence that was consistent both with his genetic profile and that of the victim. Although statistical data was introduced about the DNA evidence which was identified as consistent with the victim's on Watts' jacket, no corresponding statistical data on the mixed sample found on the inside of Watts' underwear was offered by the State. While the circuit judge found that statistical data had probative value, he also found that because of the mixed sample on the shorts, Dr. Tracey could not generate any statistical data with the same certainty that he was able to achieve on the jacket. He further ruled that even without statistical data, evidence of DNA samples taken from Watts' undershorts still had probative value and thus denied the defendant's motion to strike. Based on Hull v. State, 687 So.2d 708 (Miss.1996), Watts now asserts that it was error to introduce the DNA evidence without any population frequency estimates on the mixed sample since it was introduced on the jacket. He raises this claim despite testimony by his own expert witness, Dr. Ronald Acton, that any evidence of mixed DNA samples needs to be viewed with great caution.
"This Court has held that `where the trial court finds that evidence of DNA match is admissible as relevant, the court should also allow scientific statistical evidence which shows the frequency with which the match might occur in the given population.' Hull, 687 So.2d at 728. In Crawford v. State, 716 So.2d 1028 (Miss.1998), we found that it was `proper' for an expert to present statistical evidence as to the frequency with which a DNA match might occur within the general population. Crawford, 716 So.2d at 1046. Thus, where such evidence is offered in conjunction with evidence of a DNA match made on the basis of either PCR or RFLP analysis, the circuit court should allow its introduction. However, that does not mean that it is an abuse of discretion for the circuit court to allow evidence of DNA matching without also requiring statistical analysis of the match. See Polk v. State, 612 So.2d 381, 390 (Miss.1992) (where trial court allowed evidence of a DNA match but disallowed statistical analysis, this Court found expert testimony regarding DNA match admissible, but did not address admissibility of statistics or trial court's refusal to admit same). Indeed, in Polk, it was suggested that evidence that tends to go to the matter of the reliability of DNA testing goes only to the credibility of the evidence offered. Polk, 612 So.2d at 390 n. 2, 393.
"Whether population frequency statistics are really helpful to the jury was discussed recently in Hepner v. State, 966 S.W.2d 153 (Tex.Ct.App.1998). There, the Texas court addressed the defendant's claim that he was unfairly prejudiced by the defense's introduction of the same statistical data Watts now claims should have been admitted. While the Court found that the probative value of the statistical evidence outweighed *766 its prejudicial value, it noted the testimony of Dr. Jonathan Koehler, which highlighted the relative insignificance of the population statistical data in comparison to laboratory error rates, which usually are not presented to the jury. Hepner, 966 S.W.2d at 157-58.
"Watts appears to want to have his cake and eat it, too, with regard to the DNA statistical evidence; While in Issue III, infra, he contends that statistical evidence should have [been] provided along with the DNA evidence taken from his undershorts, he asserts in this assignment of error that statistical evidence regarding DNA samples taken from his jacket should not have been admitted. His own expert witness cautioned against extensive reliance upon mixed DNA samples and noted the variety of combinations that could be derived just from the material found on Watts' undershorts. Given that evidence, one would have to question the reliability of any statistical evidence that might be derived therefrom. Indeed, this Court's decision in Crawford calls into question the reliability of population frequency statistics to mixed DNA samples without also considering the odds of these two particular individuals' DNA being present on the same item. Crawford, 716 So.2d at 1045. Further, as the testimony in Hepner, as well as in Dr. Koehler's articles, suggests, the introduction of statistical evidence can be meaningless without any evidence of the testing laboratory's error rate. Given that the population statistics, or lack thereof, like evidence of laboratory error rates, go to the credibility of the DNA matching evidence, it cannot be said that the circuit court improperly refused to strike the evidence of the DNA samples found in his undershorts."
733 So.2d at 223-24 (footnote omitted).
We agree with the rationale of the Mississippi Supreme Court. In Watts, like this case, the defense expert testified that population-frequency statistical information was not usually calculated for mixed samples because, he testified, the information from such a sample was deceiving. Given that both experts agreed that this information was not routinely compiled we cannot say that the trial court abused its discretion in failing to suppress the DNA evidence because no population-frequency statistical information was presented.

XII.
Turner next argues that the prosecutor's misconduct during the guilt phase of the proceedings denied him a fair trial and a reliable verdict. Specifically, Turner argues that several statements made by the prosecutor during his arguments to the jury resulted in his being denied a fair trial. He also contends that the cumulative effect of the errors mandates that his conviction be reversed.
In Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), the United States Supreme Court stated the following concerning a prosecutor's responsibility:
"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor  indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is *767 as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
"It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."
295 U.S. at 88, 55 S.Ct. 629. "`A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.'" Reeves v. State, 807 So.2d 18, 44-45 (Ala.Crim.App.2000), cert. denied, 534 U.S. 1026, 122 S.Ct. 558, 151 L.Ed.2d 433 (2001), quoting Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App. 1997). The standard for evaluating the propriety of a prosecutor's argument is whether the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
"`A prosecutor may argue in closing any evidence that was presented at trial. He may also "`present his impressions from the evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way.'" Williams v. State, 601 So.2d 1062, 1073 (Ala.Cr.App. 1991), aff'd without opinion, 662 So.2d 929 (Ala.1992), quoting Donahoo v. State, 505 So.2d 1067, 1073.'"
Broadnax v. State, 825 So.2d 134, 208 (Ala. Crim.App.2000), quoting Williams v. State, 627 So.2d 994 (Ala.Crim.App.1992), aff'd, 627 So.2d 999 (Ala.1993).
Initially, we observe that there were no objections to any of the challenged comments made in the guilt phase of the proceedings. Therefore, we are limited to evaluating this issue under the plain-error standard. Rule 45A, Ala.R.Crim.P. As the Alabama Supreme Court stated in Ex parte Windsor, 683 So.2d 1042, 1061 (Ala. 1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997):
"`"While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice." Ex parte Kennedy, 472 So.2d [1106,] at 1111 [(Ala.1985)] (emphasis in original). "This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful." Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). "Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings." United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.), cert. denied, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986). See also Biddie v. State, 516 So.2d 837, 843 (Ala.Cr.App.1986), reversed on other grounds, 516 So.2d 846 (Ala.1987).'"
(Quoting Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).)

A.
Turner argues that the prosecutor argued facts not in evidence when he made the following argument:

*768 "The third charge we've got to look at is robbery. Did Darryl Turner commit robbery? Well, we know he caused her physical harm because she died. We know that he committed a crime because we know that he committed theft. We know he committed burglary. So did he have any intent to rob her? Who's the one who said, `Man, I got a lick to do'? Who said that? Tavares McCurley told you that Darryl Turner came to his house and said, `Man, get up. I've got a lick to do,' and Tavares said, `No man. I'm not with that. I'm not going.' Darryl Turner told Heath Emerson that no, Chris Harris had the lick to do. Think about that for just a minute. Who went to whose house? You know that Darryl Turner went over to Tavares's house and Chris's house. he went there. Does it make sense that Darryl Turner would go over and wake Chris Harris up in the morning and Chris Harris would immediately jump over and say, `Hey, man, let's go do a lick'? Besides, who knew L.T. Southard was out of town? The only person who could have known that was Darryl Turner. How did he know? Because L.T. Southard worked with Greg Coleman. Greg Coleman lived with Darryl Turner. L.T. himself told you he didn't know he was going out of town until 4:00 that morning when he got a telephone call from his boss. Who did he go out of town with to work in Bessemer? Greg Coleman. Greg Coleman and Darryl lived together. It makes sense that only Darryl could have known that L.T. was out of town. That's why he went to the house to steal her car because L.T. was gone. Now is a safe time. L.T. is not home. He was the only one that could have known that. Chris Harris would have never said, `hey, man, I've got a lick to do,' if he thought L.T. Southard and Barbara were both there."
(R. 683-84.) Turner argues that the above testimony implied that Turner was the mastermind behind the crime and that he knew that the victim's boyfriend would not be home.
Evidence was presented indicating that Turner lived with Greg Coleman, a coworker of the victim's boyfriend L.T. Southard. Clearly, the evidence established that Turner was the only one of the three who might have had access to the information that Southard had been called away on business and would not be at the victim's home that evening. Turner was the only one of the three who knew the victim and her boyfriend. Also, Coleman testified that Turner approached Tavares McCurley and Chris Harris and asked if they wanted to help him commit a robbery. Clearly, the prosecutor's argument was a legitimate inference that could have been drawn from the evidence presented at trial.
Turner also argues that the prosecutor argued facts not in evidence, i.e., that the sperm recovered from the victim was his, when he made the following argument:
"Now, you look at the rape. Rodger Morrison, who's been a forensic scientist for almost 30 years, came in here and told you that there was sperm so we know she had sexual intercourse. Was it forced? Was it forcible rape? You saw the pictures. You heard Angela talk about her mom. She was gagged. She was naked. She had been tied up, according to Darryl, and she was smothered to death. Yes, it was forcible. There's absolutely no doubt about that.
"So whose sperm was it? Well, you heard Rodger Morrison with his years of experience say, Darryl Turner is not excluded as a possible source of that sperm. Darryl Turner is not excluded. Who is excluded, Mr. Morrison? Well, *769 Trent Rainey, excluded. L.T. Southard, excluded. Chris Harris, excluded. It cannot be their sperm. The only people whose DNA was present was Barbara Wilson and Darryl Turner. It's a vaginal swab. I know Barbara Wilson is going to be there. So who else is left? Darryl Turner.
"But now, could you ask Rodger Morrison, Mr. Morrison, are you saying that it's definitely Darryl Turner's semen? Did he tell you that? No. Did he say, yes, it's a match, it is his semen? No, he didn't tell you that. The reason he told you he couldn't tell you that is it could be John Doe in Montana. It could be the semen of Sam Smith in New York City, or it could be the semen of Jack Jones in Mississippi. But the point of the matter is, Sam Smith, Jack Jones, and John Doe weren't at 100 Fishhook Drive on February the 21, 1996. The evidence has shown you who was there. Darryl Turner, himself, told Heath Emerson who was there. We know that L.T. Southard was there until 5:30 in the morning. No doubt about that. Darryl Turner says that Trent Rainey was there. You heard Heath Emerson. We can't even put Trent Rainey in town on that day, but he says, he's there. He was tested, and we know that Darryl Turner was there. Darryl Turner, himself, told Heath, I was there. So of these people that were there, whose semen could it be? Darryl Turner. And both experts, both the State's experts, and the one that was paid by the defense says the same exact thing, if you tell me these are the only people who were in that home, Trent Rainey, Darryl Turner, L.T. Southard, and Chris Harris, both experts say, I can positively tell you that that semen belonged to Darryl Turner, guilty as charged."
(R. 686-88.) The comments above were clearly either comments on the evidence presented at trial or legitimate inferences that could have been drawn based on all of the evidence presented. There was no improper argument here.

B.
Turner further argues that the State erroneously argued victim-impact evidence in the guilt phase of the trial and that such evidence prejudiced him and warrants a new trial. Specifically, Turner argues that the following comments made in the State's opening statement were improper victim-impact evidence:
"Angela Anderson on that same day is still trying to reach her mother. She called her. She drives by the house because her two-year-old daughter is still there, keep in mind, and the evidence will be and Angela will tell you that she kept trying to reach her mom. No answer. She drives by. The car is gone. She will tell you that her mom had a brother in the hospital in Nashville, and Angela assumed that possibly there had been an emergency and she had gone to Nashville or gone somewhere else. She called the family and they didn't know where she was. She calls her sister and her brother and the rest of the family. They still don't know where she is. Angela, although concerned, goes to bed that night thinking there must have been an emergency.
"Angela will tell you that the next day, February the 22, she wakes up and she cannot get off of her mind that she can't find her mom and Rosalyn. She's a crossing guard. While she was crossing it occurred to her, mom might have left me a note at her house. That's the only logical thing that she could think of. She left work even a little bit early and she went back to 100 Fishhook Drive. It was almost 24 hours from the time she had dropped off her two-year-old *770 daughter, Rosalyn, at that house. She walked up and Rosalyn came out on the carport. The carport door was open, and Angela will tell you that Rosalyn led her back to the guest bedroom, and that's where Angela Anderson found her mother."
(R. 369-71.)
We agree with the State that the above statements were not victim-impact statements. Victim-impact statements typically "describe the effect of the crime on the victim and his family." Payne v. Tennessee, 501 U.S. 808, 821, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The remarks made by the prosecutor were based on Angela Anderson's testimony as to the events leading to her discovery of her mother's body. The statements were all supported by the evidence introduced at trial.
Turner also argues that the following statements were victim-impact statements that prejudiced him and warrant a new trial.
"You know, you get back to one thing that we've kind of overlooked, and that is that there's an eyewitness to this crime. It was a two-year-old, Rosalyn Anderson. We've ignored that. She was in that house all night long, 24 hours with her dead grandmother. She either watched her grandmother being raped or she was in the house while her grandmother was raped. She was in there all night long while her grandmother lay there naked with a gag in her mouth soiled because she had been smothered to death. Darryl Turner thought nothing of raping her. He thought nothing of taking her life because he didn't respect her life. He thought nothing of leaving Rosalyn's grandmother there just like she was, with the three of them leaving and then allowing all of us to sit in this courtroom and watch that videotape of how she was found or of letting Angela find her mother that way or of letting Rosalyn spend the night with her grandmother while she was dead. Barbara Wilson didn't deserve what he did to her, and Barbara didn't deserve to die."
(R. 719-20.) We agree with the State that the above remarks were not victim-impact statements. Moreover, the remarks were supported by the evidence that was presented at trial.

C.
Turner further argues that the cumulative effect of the prejudicial arguments made by the prosecutor resulted in his being denied a fair trial and a reliable sentencing.
As we stated in Ferguson v. State, 814 So.2d 925, 950 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001):
"Because we find that no single instance of the prosecutor's conduct was improper, any claim that the alleged improper conduct had a cumulative prejudicial effect on his trial is without merit and does not require a reversal. See Stewart v. State, 730 So.2d 1203 (Ala.Crim. App.1996), aff'd, 730 So.2d 1246 (Ala.), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999); Hunt v. State, 642 So.2d 999 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994)."

XIII.
Turner next argues that the trial court erred when it failed to instruct the jury that it could draw no adverse inference from Turner's exercise of his right to remain silent. Turner cites the United States Supreme Court case of Carter v. Kentucky, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), and contends that it was reversible error for the trial court to fail to give a no-adverse-inference instruction *771 after such an instruction was requested by the defense.
The United States Supreme Court in Carter v. Kentucky, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), held that it was reversible error for a trial court to fail to give a jury instruction on the defendants's failure to testify when the defendant requested that such an instruction be given. The Carter court stated:
"The freedom of a defendant in a criminal trial to remain silent `unless he chooses to speak in the unfettered exercise of his own will' is guaranteed by the Fifth Amendment and made applicable to state criminal proceedings through the Fourteenth. Malloy v. Hogan, 378 U.S. [1] at 8 [(1964)]. And the Constitution further guarantees that no adverse inferences are to drawn from the exercise of that privilege. Griffin v. California, 380 U.S. 609 [(1965)]. Just as adverse comment on a defendant's silence `cuts down on the privilege by making its assertion costly,' id., at 614, the failure to limit the jurors' speculation on the meaning of that silence, when the defendant makes a timely request that a prophylactic instruction be given, exacts an impermissible toll on the full and free exercise of the privilege. Accordingly, we hold that a state trial judge has the constitutional obligation, upon proper request, to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify."
450 U.S. at 305, 101 S.Ct. 1112. Alabama cases have cited the Supreme Court's holding in Carter. See Ex parte Weaver, 763 So.2d 982 (Ala.1999); Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000), cert. denied, 795 So.2d 842 (Ala.), cert. denied, 534 U.S. 872, 122 S.Ct. 166, 151 L.Ed.2d 113 (2001); Phillips v. State, 726 So.2d 292 (Ala.Crim.App.1998); Felder v. State, 593 So.2d 121 (Ala.Crim.App.1991).
In this case, the following occurred at the conclusion of the trial court's charge to the jury:
"[Defense counsel]: Judge, we would object and except to the Court's failure to charge with regard to the defendant's right not to testify and that evidence not be held against him.

"The Court: Didn't I so charge?
"[Defense counsel]: If you did, I didn't catch it.
"The Court: Let me go back and share with you what I said. (Indicating)
"[Defense counsel]: Judge, I apologize.
"The Court: I did charge on that.
"[Defense counsel]: Okay.
"The Court: He's not required to do so and prove his innocence 
"[Defense counsel]: I just missed it. That's the only thing I had, Judge.
"[Defense counsel]: We're satisfied, Your Honor."
(R. 755-56) (Emphasis added.) The above discussion shows that the trial court gave an instruction addressing the defendant's failure to testify and that defense counsel announced that he was satisfied with the instruction. This is not a situation, as was the case in Carter, where no instruction was given. Any conceivable error in the sufficiency of the trial court's jury instruction was invited by defense counsel's acquiescence to the charges given.
"`A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions. 24A C.J.S. Criminal Law § 1842 (1962). See also Brannon v. State, 12 Ala.App. 189, 67 So. 634, 635 (1914), cert. denied, 191 Ala. 29, 67 So. 1007 (1915); Livingston v. State, 7 Ala. App. 43, 61 So. 54, 57 (1912) (on rehearing).' *772 Leverett v. State, 462 So.2d 972, 976-77 (Ala.Cr.App.1984)."
Perkins v. State, 580 So.2d 4, 10 (Ala.Crim. App.1990). We refuse to find any plain error here.
Moreover, the trial court gave the following instruction:
"When a defendant is placed on trial charged with the commission of a public offense, the law says that he is presumed to be innocent of the offense. This defendant enters this trial with the presumption of innocence in his favor, and it is a fact which is to be considered as evidence, and should not be disregarded. This presumption of innocence remains with the defendant during the trial until overthrown by evidence which convinces the jury of the defendant's guilt beyond a reasonable doubt. A defendant is not required to testify or prove his innocence and is not required to produce any evidence.
"The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case.
". . . .
"A reasonable doubt may arise not only from the evidence produced but also from the lack of evidence. The burden is upon the State to prove the defendant guilty beyond a reasonable doubt of every essential element of the crime or crimes charged. A defendant has the right to rely upon the failure of the prosecution to establish such proof. A defendant may also rely upon evidence brought out on cross-examination of witnesses for the prosecution and upon evidence presented on behalf of the defendant. The law never imposes upon a defendant in a criminal case the burden or duty of producing any evidence."
(R. 723-24.)
The Carter Court did not comment on what constitutes a sufficient jury instruction. However, the United States Court of Appeals for the Tenth Circuit in United States v. Gomez-Olivas, 897 F.2d 500 (10th Cir.1990), stated:
"Of course, it is well settled that the form of jury instructions is a matter for the trial court's discretion, and the trial court need not give an instruction in the exact form and language requested. E.g., United States v. Gallup, 812 F.2d 1271, 1279 (10th Cir.1987). This principle is equally applicable to a no-adverse-inference instruction. See United States v. Ladd, 877 F.2d 1083, 1089 (1st Cir. 1989); United States v. Russo, 796 F.2d 1443, 1454-55 (11th Cir.1986)."
897 F.2d at 502. The Court of Appeals for the Eleventh Circuit in United States v. Russo, 796 F.2d 1443 (11th Cir.1986), approved of the following instruction:
"`The indictment or formal charge against any Defendant is not evidence of guilt. Indeed, the Defendant is presumed by the law to be innocent. The law does not require a Defendant to prove his innocence or produce any evidence at all; and if a Defendant elects not to testify, you should not consider that in any way during your deliberations. The government has the burden of proving a Defendant guilty beyond a reasonable doubt, and if it fails to do so you must find the Defendant not guilty.'"
796 F.2d at 1454-55.
The instruction given in this case was adequate under the circumstances. The instruction stated that Turner was not required to testify and that he had no obligation to put on any evidence, that Turner was presumed innocent and that that was a fact that the jury must consider as evidence, and that the State met its burden of proving him guilty only by presenting *773 evidence to overcome the presumption of innocence. It was abundantly clear in the trial court's instruction that Turner's failure to testify was not to be considered as evidence of his guilt.
The State further urges this Court to find that if error did occur it was harmless. It cites Perry v. State, 368 So.2d 310 (Ala.), on remand, 368 So.2d 312 (Ala.Crim.App. 1979), in which the Alabama Supreme Court held that the failure to give a no-adverse-inference instruction after a defendant has requested that the instruction be given can never be harmless, and argues that Perry is distinguishable from this case because, it argues, the defense here announced that it was satisfied with the jury instruction given. We note that the Alabama Supreme Court recently in Ex parte Weaver, 763 So.2d 982 (Ala.1999), on remand, 763 So.2d 987 (Ala.Crim.App. 2000), cited its earlier holding in Perry. This Court is bound by the decisions of the Alabama Supreme Court. See § 12-3-16, Ala.Code 1975.
We note that the Supreme Court's decision in Perry was released before the United States Supreme Court's decisions in Carter v. Kentucky, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), and James v. Kentucky, 466 U.S. 341, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984). Since the release of those cases the majority of courts in other states have found that the failure to give a no-adverse-inference instruction is subject to a harmless-error analysis under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). As the Supreme Court of Missouri stated in State v. Storey, 986 S.W.2d 462 (Mo.), cert. denied, 528 U.S. 895, 120 S.Ct. 226, 145 L.Ed.2d 189 (1999):
"Neither this Court nor the United States Supreme Court has decided that the failure to give a no-adverse-inference instruction can be analyzed for harmless error. In Carter [v. Kentucky, 450 U.S. 288 (1981)], the [United States] Supreme Court expressly declined to reach this issue. Carter, 450 U.S. at 304, 101 S.Ct. 1112.
"That Court articulated the test for applying Chapman's [Chapman v. California, 386 U.S. 18 (1967)] harmless-error analysis in Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The Court distinguished between `trial error,' which is subject to harmless-error review, and `structural defects,' which are not. Id. at 307-10, 111 S.Ct. 1246. Trial error occurs `during the presentation of the case to the jury, and . . . may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.' Id. at 307-08, 111 S.Ct. 1246. A structural defect, on the other hand, affects `the framework within which the trial proceeds, rather than [being] simply an error in the trial process itself.' Id. at 310, 111 S.Ct. 1246.
"Applying Fulminante, the failure to give a requested, no-adverse-inference instruction is subject to harmless-error review. The danger in refusing a no-adverse-inference instruction is that `the jury will give evidentiary weight to a defendant's failure to testify.' Carter, 450 U.S. at 305, 101 S.Ct. 1112. Such an error in the trial process does not rise to the level of a structural defect. This conclusion accords with that of most jurisdictions. See, e.g., Hunter v. Clark, 934 F.2d 856, 859-60 (7th Cir.1990), cert. denied, 502 U.S. 945, 112 S.Ct. 388, 116 L.Ed.2d 338 (1991); Finney v. Rothgerber, 751 F.2d 858, 864 (6th Cir.1985), cert. denied, 471 U.S. 1020, 105 S.Ct. 2048, 85 L.Ed.2d 310 (1985); Richardson v. Lucas, 741 F.2d 753, 755 (5th *774 Cir.1984); Burns v. State, 699 So.2d 646, 651-52 (Fla.1997), cert. denied, [522] U.S. [1121], 118 S.Ct. 1063, 140 L.Ed.2d 123 (1998); Beathard v. State, 767 S.W.2d 423, 431-33 (Tex.Crim.App. 1989); James v. Commonwealth, 679 S.W.2d 238, 239 (Ky.1984), cert. denied, 470 U.S. 1086, 105 S.Ct. 1849, 85 L.Ed.2d 147 (1985); Franklin v. State, 98 Nev. 266, 646 P.2d 543, 545-46 (1982); Parker v. State, 425 N.E.2d 628, 630 (Ind.1981); Richardson v. State, 402 So.2d 848, 852 (Miss.1981)."
986 S.W.2d at 464. See also State v. Thompson, 430 N.W.2d 151, 153 (Minn. 1988); United States v. Brand, 80 F.3d 560 (1st Cir.1996); cert. denied, Aponte-Velazquez v. United States, 519 U.S. 1077, 117 S.Ct. 737, 136 L.Ed.2d 676 (1997); People v. Evans, 62 Cal.App.4th 186, 72 Cal.Rptr.2d 543 (Cal.Ct.App.1998).
In light of the abundant caselaw in other jurisdictions, we urge the Alabama Supreme Court to consider the applicability of the harmless error doctrine to a trial court's failure to give a no-adverse-inference instruction.

XIV.
Turner argues that the trial court erred in failing to instruct the jury on felony murder as a lesser offense to the offense of capital murder. He asserts that there was no evidence presented indicating that he intended to kill the victim; therefore, he argues, a felony-murder instruction was warranted under the facts of the case.
Initially, we observe that there was no request for an instruction on felony murder and that no objection was made after the court's oral charge. Therefore, we review this issue only for plain error. Rule 45A, Ala.R.App.P.
The coroner testified that the victim was smothered to death. Turner testified that he saw his two codefendants holding a pillow over the victim's head while she fought. There was no evidence to support a conviction for felony murder. As we stated in Hall v. State, 820 So.2d 113, 139 (Ala.Crim.App.1999):
"`There was no evidence to support an instruction on felony-murder. In the instant case the evidence revealed that the victim died as a result of manual strangulation. "There is no rational basis for a verdict convicting him of felony-murder." White [v. State], 587 So.2d [1218] at 1231 [(Ala. Crim.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076 (1992)]; § 13A-1-9(b), Code of Alabama 1975.'
"Also, we stated in Dobyne v. State, 672 So.2d 1319, 1345 (Ala.Cr.App.1994), on remand, 672 So.2d 1353 (Ala.Cr.App. 1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996):
"`Lesser included offense instructions should be given when there is a "reasonable theory from the evidence" supporting such an instruction. Jenkins [v. State, 627 So.2d 1034 (Ala.Cr. App.1992), aff'd, 627 So.2d 1054 (Ala. 1993)]. Here, there was no reasonable theory to support a charge on felony-murder. "`The purpose of the felony-murder doctrine is to hold felons accountable for unintended deaths caused by their dangerous conduct.'" White v. State, 587 So.2d 1218, 1231 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992). Here, the evidence did not show that the shootings were unintended. The court did not err in not instructing the jury on the lesser included offense of felony-murder.'

*775 "The evidence showed that Haskew was shot twice in the head, beaten repeatedly, and strangled. There was absolutely no evidence presented that would bring the murder into the definition of felony murder. The manner of the killing showed that the killing was not an `unintended' murder that would fall under the definition of felony murder."
The trial court committed no plain error in failing to sua sponte instruct the jury on felony murder.

XV.
Turner argues that the trial court's instruction on reasonable doubt was flawed because, he argues, it lowered the State's burden of proof and violated the United States Supreme Court's holding in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).
Turner did not object to the trial court's jury instruction on reasonable doubt; therefore, we are limited to determining whether there is plain error. See Rule 45A, Ala.R.App.P.
The trial court gave the following instruction on reasonable doubt:
"The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case.
"A reasonable doubt is a fair doubt based upon reason and common sense and arising from the state of the evidence. It is rarely possible to prove anything to an absolute certainty.
"A reasonable doubt may arise not only from the evidence produced but also from the lack of evidence. The burden is upon the State to prove the defendant guilty beyond a reasonable doubt of every essential element of the crime or crimes charged. A defendant has the right to rely upon the failure of the prosecution to establish such proof. A defendant may also rely upon evidence brought out on cross-examination of witnesses for the prosecution and upon evidence presented on behalf of the defendant. The law never imposes upon a defendant in a criminal case the burden or duty of producing any evidence.
"A reasonable doubt exists in any case when, after careful and impartial consideration of all the evidence in the case, the jurors do not feel convinced to a moral certainty that a defendant is guilty of the charge.
"Upon considering all of the evidence or lack of evidence if you have a reasonable doubt about the defendant's guilt arising out of any part of the evidence or lack of evidence, you should find the defendant not guilty.
"The phrase reasonable doubt is self-explanatory and efforts to define it do not always clarify the term but it may help you some to say that the doubt which would justify an acquittal must be an actual and substantial doubt, and not a mere possible doubt. A reasonable doubt is not a mere guess or surmise and it is not a forced or capricious doubt. If, after considering all of the evidence in the case, you have an abiding conviction of the truth of the charge, then you are convinced beyond a reasonable doubt, and it would be your duty to convict the defendant. The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural, or speculative doubt, but a reasonably substantial doubt, arising from the evidence and remaining after a careful consideration of the testimony, such as reasonable, fair-minded, and conscientious men and women would enter under all of the circumstances.

*776 "Now, you will observe that the State is not required to convince you of the defendant's guilt beyond all doubt, but simply beyond all reasonable doubt and to a moral certainty. If, after comparing and considering all the evidence in this case, your minds are left in such a condition that you cannot say you have an abiding conviction to a moral certainty of the defendant's guilt, then you are not convinced beyond a reasonable doubt, and the defendant would be entitled to an acquittal."
(R. 723-25.)
Turner argues that the above instruction was flawed because it contains the terms "substantial doubt" and "moral certainty." We do not agree. As this Court has stated:
"In Cage v. Louisiana, the United States Supreme Court held that an instruction that equated `reasonable doubt' with `grave uncertainty,' and `actual substantial doubt' and stated that what was required to convict was a `moral certainty,' could have led a reasonable juror to interpret the instruction to allow a finding of guilt based on a lesser degree of proof than that required by the Due Process Clause. Subsequently, in Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994), `the Court "made it clear that the proper inquiry is not whether the instruction `could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it."' Knotts [v. State], 686 So.2d [431] at 459 [(Ala.Crim.App.1995)], quoting Victor, 511 U.S. at 6, 114 S.Ct. 1239 at 1243, 127 L.Ed.2d 583, quoting, in turn, Estelle v. McGuire, 502 U.S. 62, 72-73, 112 S.Ct. 475, 482, 116 L.Ed.2d 385, n. 4 (1991). The constitutional question is `whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the [In re] Winship [, 397 U.S. 358 (1970),] standard.' Victor, 511 U.S. at 6, 114 S.Ct. at 1243. In addition, the Supreme Court made it clear in Victor `that, while it did not condone the use of the Cage terminology in reasonable doubt instructions, the use of such terminology does not automatically render instructions unconstitutional if "`taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury.'"' Lawhorn v. State, 756 So.2d 971, 985 (Ala.Crim.App.1999), quoting Victor, 511 U.S. at 22, 114 S.Ct. at 1251, quoting, in turn, Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). See also Taylor v. State, 666 So.2d 36, 56 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)(`"Use of some but not all of the terminology found offensive in Cage does not automatically constitute reversible error."'); and Sockwell v. State, 675 So.2d 4, 23 (Ala.Crim.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996)(`It was the use of all three phrases in conjunction with each other that the Supreme Court determined was unconstitutional in Cage.' (Emphasis added.)). Thus, in reviewing the reasonable-doubt instruction in this case, we do so in the context of the trial court's charge as a whole; as long as the concept of `reasonable doubt' was correctly conveyed to the jury, we will not find error. See, e.g., Knotts, supra.
"Here, the trial court's charge, as a whole, correctly conveyed the concept of reasonable doubt to the jury; it did not lessen the State's burden of proof. The trial court's mere use of the phrase `reasonably substantial doubt' cannot be equated with the instruction condemned in *777 Cage, where the reasonable-doubt instruction contained the phrase `actual substantial doubt' as well as the phrases `grave uncertainty' and `moral certainty.' See, e.g., Dobyne v. State, 672 So.2d 1319 (Ala.Crim.App.), opinion after remand, 672 So.2d 1353 (Ala.Crim.App. 1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996)(upholding a charge using the phrase `reasonably substantial doubt' because it `contained none of the terms that the United States Supreme Court found questionable in Victor and reversible in Cage'). The reasonable-doubt instruction in this case was not misleading or confusing, and there was no reasonable likelihood that the jury applied the instruction in an unconstitutional manner. Accordingly, we find no error as to this claim."
Reeves v. State, 807 So.2d 18, 40-41 (Ala. Crim.App.2000). The Alabama Supreme Court has stated,
"In Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), the United States Supreme Court held that jury instructions on reasonable doubt that incorporated the terms `moral certainty,' `abiding conviction,' and `substantial doubt,' did not lower the standard for determining what the term `guilt beyond a reasonable doubt' means."
Ex parte Slaton, 680 So.2d 909, 920 (Ala. 1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). The trial court's jury instructions on reasonable doubt were both thorough and accurate; they did not lower the State's burden of proof. There was no error, much less plain error, here.

XVI.
Turner argues that the State failed to present sufficient evidence to convict him of both rape and murder made capital because it was committed during a rape. Specifically, he argues that there was no evidence indicating that he intended to kill the victim so as to support his capital-murder conviction nor, he argues, was there evidence of forcible compulsion, evidence necessary to support a rape conviction.
When reviewing the sufficiency of the evidence to support a conviction, we apply the standard articulated by the Alabama Supreme Court in Ex parte Woodall, 730 So.2d 652 (Ala.1998), on remand, 730 So.2d 666 (Ala.Crim.App.1999). The Woodall Court stated:
"`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485 (Ala.Cr. App.1984), aff'd, 471 So.2d 493 (Ala. 1985).' Powe v. State, 597 So.2d 721, 724 (Ala.1991). It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt, Pennington v. State, 421 So.2d 1361 (Ala.Cr.App.1982); rather, the function of this Court is to determine whether there is legal evidence from which a rational finder of fact could have, by fair inference, found the defendant guilty beyond a reasonable doubt. Davis v. State, 598 So.2d 1054 (Ala.Cr. App.1992). Thus, `[t]he role of appellate courts is not to say what the facts are. [Their role] is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.' Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978)(emphasis original)."
730 So.2d at 658.
"`The question of whether a defendant intentionally caused the death of *778 another person is a question of fact for the jury. Carr v. State, 551 So.2d 1169 (Ala.Cr.App.1989).' Ex parte Carroll, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171 (1994). `The question of intent is hardly ever capable of direct proof. Such a question is normally a question for the jury. Loper v. State, 469 So.2d 707 (Ala.Cr.App.1985).' Lucas v. State, 792 So.2d 1161, 1168 (Ala. Crim.App.1999), rev'd on other grounds, 792 So.2d 1169 (Ala.2000), on remand, 792 So.2d 1175 (Ala.Crim.App.2001)."
Dorsey v. State, 881 So.2d 460, 521 (Ala. Crim.App.2001).
The State presented evidence indicating that Turner organized the events that occurred at the victim's home. It can be inferred from the evidence that Turner knew that the victim would be alone in her home on the evening of the murder because her boyfriend, who worked with Turner's roommate, was out of town on a construction job. McCurley testified that Turner came by his house and asked if he would go with him to "get a lick" meaning, he said, to rob someone. He also said that later that same day Turner came back by this house and that when he did he was driving the victim's Cadillac. McCurley also said that he "killed the bitch" so that she could not tell police what the three had done. Turner was the only one of the three that took anything of value from the victim. Turner was seen in the victim's car and he pawned the victim's television set. Also, the victim's nude body was found on a bed in the house. She had been gagged and suffocated to death. It is not necessary for the State to prove that Turner was the actual one of the three codefendants who committed the murder. Under Alabama law it is irrelevant whether Turner or one of his codefendants killed the victim. As we stated in Travis v. State, 776 So.2d 819 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), cert. denied, 531 U.S. 1081, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001):
"`"Aid and abet `comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary.' Jones v. State, 174 Ala. 53, 57, 57 So. 31 (1911), quoted in Radke v. State, 292 Ala. 290, 292, 293 So.2d 314 (1974). If the jury is convinced beyond a reasonable doubt that the defendant was present with a view to render aid should it become necessary, the fact that the defendant is an aider and abettor is established. Jones, supra; Raiford v. State, 59 Ala. 106, 108 (1877). "The culpable participation of the accomplice need not be proved by positive testimony, and indeed rarely is so proved. Fuller v. State, 43 Ala.App. 632, 198 So.2d 625 [(1966)]. Rather, the jury must examine the conduct of the parties and the testimony as to the surrounding circumstances to determine its existence." Miller v. State, 405 So.2d 41, 46 (Ala.Cr.App.1981); Watkins v. State, 357 So.2d 156, 159 (Ala.Cr.App. 1977), cert. denied, 357 So.2d 161 (Ala. 1978).'
"(Emphasis in original.)
"Moreover, while mere presence of an individual at the time and place of a crime does not make him a party to the crime, any assistance rendered in furtherance of commission of the offense will suffice.
"`"Recognizing the principle that the mere presence of an individual at the time and place of a crime does not make him a party to that crime, it must also be remembered that the words `aid and abet' comprehend all assistance rendered by acts, words of *779 encouragement or support, or presence, actual or constructive, to render assistance should it become necessary. No particular acts are necessary. Radke v. State, 292 Ala. 290, 293 So.2d 314 (1974). The common enterprise or adventure may have been entered into on the spur of the moment without pre-arrangement or preparation. Fuller v. State, 43 Ala.App. 632, 198 So.2d 625 (1966). The appellant's actual participation need not be proved by positive testimony; the jury is to determine whether it exists and the extent of it from the conduct of the parties and all the testimony adduced. Knight v. State, 50 Ala.App. 457, 280 So.2d 163 (1973)."
"`Community of purpose may be formed in a flash, and participation and community of purpose may be shown by circumstantial evidence or inferred from the conduct of the participants. Smith v. State, 57 Ala.App. 151, 326 So.2d 680 (1975), cert. denied, 295 Ala. 419, 326 So.2d 686 (1976). Such facts as the defendant's presence in connection with his companionship, his conduct at, before, and after the commission of the act, are potent circumstances from which participation may be inferred. Smith, supra.'"
776 So.2d at 863 (quoting Sanders v. State, 423 So.2d 348, 350-51 (Ala.Crim.App. 1982)).
The evidence showed that Turner told police that he did not kill the victim but that he watched as his codefendants held a pillow over her head as she struggled to free herself. Turner's actions both before and after the crime showed that he was present to render encouragement or support if necessary. Turner's admitted participation shows that he aided and abetted in Wilson's murder.
Moreover, whether the victim was forcibly compelled to have intercourse was a question for the jury to resolve. Here, the condition of the scene of the crime and the condition of the body would lead a reasonable person to believe that Wilson had been raped. Wilson's nude body was found on a bed in her home  in a room that was not her bedroom. Wilson had been gagged and tied up. Forensic tests revealed the presence of semen in her vagina. A knife was lying on a bedside table and a telephone cord was under her body. The victim had defense-type wounds on her hands. Blood discovered at the scene of the murder matched the victim's. Also, DNA tests conducted on the semen excluded Wilson's boyfriend and the other codefendants as the source of the semen. The condition of the body showed that the victim was not a willing participant to the events that ultimately led to her death. There was "sufficient evidence to permit the question of `forcible compulsion' to be submitted to the jury." Parks v. State, 565 So.2d 1265, 1269 (Ala.Crim. App.1990).

XVII.
Turner also argues that it was a violation of the Double Jeopardy Clause to convict him of the capital offenses of murder during a robbery and murder during a rape and the offenses of robbery, theft, and rape. The State concedes that it was error for the trial court to accept verdicts on the lesser-included offenses, and it requests us to we remand this case to the Circuit Court of Limestone County for that court to vacate the convictions and sentences for robbery, theft, and rape.
Turner's convictions for robbery, rape, and theft are encompassed in the greater capital offenses. The crimes of robbery and theft are included in the greater offense of murder during a robbery. *780 Rape is included in the greater offense of murder during a rape. A defendant cannot be convicted of both a greater offense and a lesser-included offense based on the same set of facts. Simmons v. State, 797 So.2d 1134 (Ala.Crim.App.2000), cert. denied, 797 So.2d 1186 (Ala.), cert. denied, 534 U.S. 932, 122 S.Ct. 298, 151 L.Ed.2d 221 (2001). As the Alabama Supreme Court stated in Ex parte Frazier, 758 So.2d 611 (Ala.1999), cert. denied, 531 U.S. 843, 121 S.Ct. 109, 148 L.Ed.2d 66 (2000), when affirming this Court's decision:
"The Court of Criminal Appeals affirmed Frazier's conviction and sentence of death as to Count I. However, that court, relying on Borden v. State, 711 So.2d 498, 503 (Ala.Crim.App.1997) (`[W]here . . . the jury returns guilty verdicts for both a capital offense alleged in one count of the indictment and [as to a capital offense alleged in another count of the indictment,] the lesser included offense of intentional murder. . . and the same murder was an element of the capital offense and the intentional murder conviction, the trial court should enter a judgment on only one of the offenses.') and Mangione v. State, 740 So.2d 444, 449 (Ala.Crim.App. 1998) (`[T]he prohibition against double jeopardy was violated when the [defendant] was convicted of the capital offense of murder during the course of a kidnapping under Count I of the indictment and also was convicted of the lesser-included offense of intentional murder under Count III of the indictment, because the "same murder was an element of the capital offense and the intentional murder conviction."'), reversed Frazier's conviction for intentional murder under Count III and remanded with directions for the trial court to vacate that conviction, holding that `the trial court could not adjudge the [defendant] guilty of both capital murder under Count I of the indictment and the lesser-included offense of intentional murder under Count III.' Frazier v. State, 758 So.2d [577] at 583-84 [(Ala.Crim.App.1999)]."
758 So.2d at 614. This Court in Borden v. State, 711 So.2d 498 (Ala.Crim.App.1997), aff'd, 711 So.2d 506 (Ala.), cert. denied, 525 U.S. 845, 119 S.Ct. 113, 142 L.Ed.2d 91 (1998), stated:
"[T]he principles of double jeopardy were violated when the appellant was convicted of the lesser included offense of intentional murder under Count II, which alleged the capital offense of murder committed by or through the use of a deadly weapon fired from outside a dwelling while the victim was inside a dwelling, and he was also convicted of the capital offense of double murder under Count I. See Coral v. State, 628 So.2d 954, 958 (Ala.Cr.App.1992) (double jeopardy was violated by defendant's conviction of the lesser included offense of intentional murder under an indictment count alleging the capital offense of murder-robbery and also under an indictment county alleging the capital offense of murder-burglary, where same murder was an element of the capital offense and the intentional murder conviction)."
711 So.2d at 503. Accordingly, this case is due to be remanded for the trial court to vacate Turner's convictions and sentences for robbery, theft, and rape.
Turner does not challenge his conviction for burglary. This conviction was not an element of the two capital-murder offenses and was based on facts independent of the other charges.

Penalty-Phase Issues

XVIII.
Turner argues that the trial court erred in sentencing him without the benefit of a *781 recommendation from the jury. Specifically, he argues that the trial court erred in not informing him of his right to a sentencing hearing before a jury and in not conducting a colloquy to determine whether Turner voluntarily waived his right to a sentencing hearing before a jury.
Initially, we observe that Turner did not make any objection to the sentencing procedure until he filed a motion for a new trial. Also, Turner's only argument in his motion was that the trial court failed to have an extensive colloquy with him before he waived his right to a sentencing hearing before a jury. Moreover, this issue was not presented to the trial court during the hearing on the motion for a new trial. Turner's objection was untimely; therefore, we look for plain error. Rule 45A, Ala.R.App.P.
The record reflects that the following occurred after the jury returned with its guilty verdicts in the guilt phase:
"The Court: All right. Let's approach, please.
"(Whereupon, attorneys approach the Bench.)
"[Defense counsel]: Judge, after consultation with our client and members of his family, we're satisfied and he's made the decision, his own voluntary decision and his own reasoned out position supported by this family that Mr. Turner will waive the right for the jury to make a recommendation in this case.

"The Court: Is that consented to by the State?
"[Prosecutor]: Yes, Your Honor.
"The Court: As I understand the law, if that's agreed to by both parties and the Court consents, that may be done and may be waived pursuant to the statute. That would be granted.
"Based on that, I need to order a presentence investigation and set a sentencing hearing. That's what we'll do. I'll explain that to the jury, and they will be discharged."
(R. 772-73) (emphasis added). The trial court made the following findings in its sentencing order:
"Following the adjudication of guilt, the defendant became highly emotional, began shouting obscenities in the courtroom, and contributed to a court disturbance that lasted for a period of time. The defendant calmed down and met separately with his trial counsel, the Honorable Larry Madison and the Honorable Scott Anderson and then informed the Court of the defendant's desire to waive the right to have the sentence hearing conducted before a jury as provided by Code of Alabama, 1975, § 13A-5-46. Further, pursuant to said statute, both parties with the consent of the Court waived the right to the sentence hearing conducted before the jury, and all proceedings were ended that day. This case was continued for a sentence hearing to be held this date."
(C.R. 232.) It is clear from the trial court's remarks that events occurred after the jury returned its verdicts that are not included in the record. There is no indication in the transcript of the trial proceedings that Turner had an outburst in front of the jury.
Turner argues that the trial court did not inform him of his right to a sentencing hearing before a jury. Section 13A-5-44(c), Ala.Code 1975, provides:
"(c) Notwithstanding any other provision of law, the defendant with the consent of the state and with the approval of the court may waive the participation of a jury in the sentence hearing provided in Section 13A-5-46. Provided, however, before any such waiver is valid, it must affirmatively appear in the record *782 that he defendant himself has freely waived his right to the participation of a jury in the sentence proceeding, after having been expressly informed of such right."
Waiving a sentencing hearing before a jury is also referenced in § 13-5-45(a), Ala.Code 1975, and § 13A-5-46(a), Ala. Code 1975.
The above quote from the transcript clearly reflects that Turner was informed of his right to have a sentencing hearing before a jury. The record and the court's order, when considered as a whole, are sufficient to show that § 13A-5-44(c) was complied with. As we stated in Thomas v. State, 824 So.2d 1, 77 (Ala.Crim.App.1999):
"After reviewing the record, we conclude that the trial court complied with the requirements of § 13A-5-44(c) in reference to the appellant's waiver of jury participation in his resentencing. It affirmatively appears in the record, when that record is considered in its entirety, that the appellant himself waived his right to jury participation in the resentencing proceedings after he was expressly informed of such right."
See Talley v. State, 687 So.2d 1261 (Ala. Crim.App.1996).
Moreover, the transcript clearly shows that the waiver was voluntary. The United States Supreme Court in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), stated:
"This Court has pointed out that jury sentencing in a capital case can perform an important societal function, Witherspoon v. Illinois, 391 U.S. 510, 519 n. 15 (1968), but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases."
428 U.S. at 252, 96 S.Ct. 2960 (footnote omitted). The right to have a jury recommend a sentence in a capital case is a right afforded by statute  not the Alabama Constitution of 1901. See § 13A-5-45, Ala.Code 1975. A waiver of a statutory right requires a lower standard to uphold than a waiver of a constitutional right. See Ex parte Dunn, 514 So.2d 1300 (Ala. 1987), and Watson v. State, 808 So.2d 77 (Ala.Crim.App.2001).
When determining the validity of any waiver we look at the particular facts of the case and the totality of the circumstances. See Whitt v. State, 733 So.2d 463 (Ala.Crim.App.1998). Turner's waiver followed his disruption of the court process by yelling obscenities in the presence of the jury. It is clear that Turner's lawyer had a thorough discussion with Turner and Turner's family about Turner's waiving his right a jury sentencing hearing. Also, the record contains a statement prepared and read by Turner at his sentencing hearing before the trial court. This statement clearly indicates the voluntariness of Turner's actions. Based on the record in this case we find no plain error.

XIX.
Turner argues that execution by electrocution is cruel and unusual punishment.
In July 2002, the Alabama Legislature amended § 15-18-82, Ala.Code 1975, that defines the method of execution. Section 15-18-82(a), now reads:
"(a) Where the sentence of death is pronounced against a convict, the sentence shall be executed at any hour on the day set for the execution, not less *783 than 30 nor more than 100 days from the date of sentence, as the court may adjudge, by lethal injection unless the convict elects execution by electrocution as provided by law. If electrocution is held unconstitutional, the method of execution shall be lethal injection."
Section 15-18-82.1, Ala.Code 1975, was also added at that time. This statute reads, in part, as follows:
"(a) A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution. The sentence shall be executed pursuant to Section 15-18-82.
"(b) A person convicted and sentenced to death for a capital crime at any time shall have one opportunity to elect that his or her death sentence be executed by electrocution. The election for death by electrocution is waived unless it is personally made by the person in writing and delivered to the warden of the correctional facility within 30 days after the certificate of judgment pursuant to a decision by the Alabama Supreme Court affirming the sentence of death or, if a certificate of judgment is issued before July 1, 2002, the election must be made and delivered to the warden within 30 days after July 1, 2002. If a warrant of execution is pending on July 1, 2002, or if a warrant is issued within 30 days after July 1, 2002, the person sentenced to death who is the subject of the warrant shall waive election of electrocution as the method of execution unless a written election signed by the person is submitted to the warden of the correctional facility no later than 48 hours after a new date for execution of the death sentence is set.
"(c) If electrocution or lethal injection is held to be unconstitutional by the Alabama Supreme Court under the Constitution of Alabama of 1901, or held to be unconstitutional by the United States Supreme Court under the United States Constitution, or if the United States Supreme Court declines to review any judgment holding a method of execution to be unconstitutional under the United States Constitution made by the Alabama Supreme Court or the United States Court of Appeals that has jurisdiction over Alabama, all persons sentenced to death for a capital crime shall be executed by any constitutional method of execution."
"This Act [authorizing death by lethal injection] applies to all persons currently on Alabama's death row." Tomlin v. State, 909 So.2d 213, 278 (Ala.Crim.App.2002). Because the method of execution has been changed to allow death by lethal injection, Turner's argument challenging the constitutionality of electrocution as a method of imposing the death penalty is moot. Harrison v. State, 869 So.2d 509 (Ala.Crim. App.2002), and Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002).

Trial Court's Sentencing Order

XX.
Turner next argues that the trial court's order sentencing him to death is deficient in several aspects. The State concedes error in certain portions of the sentencing order and requests that we remand the case to the trial court for that court to correct the deficiencies. To assist the trial court in correcting its sentencing order we will address each argument raised by Turner in his brief to this Court.
Before we address the challenges to the trial court's order sentencing Turner to death, we take this opportunity to address the effects of the recent United States Supreme Court opinion in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), on this case. The *784 Supreme Court in Ring applied its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death-penalty cases. The Ring court held that, "[c]apital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589, 122 S.Ct. at 2432.[11]
In Ring, the defendant was convicted of felony murder. Under Arizona law the maximum sentence he could receive was life imprisonment without the possibility of parole. Arizona does not define any particular types of murder as punishable by death. However, Ring could be sentenced to death if the trial court found the presence of an aggravating circumstance. In Arizona, the trial court was the sole finder of the existence of any aggravating circumstances that would support a death sentence. In Ring, the trial court heard testimony from one of Ring's codefendants. This codefendant testified that Ring was the instigator behind the robbery, that he planned the robbery, and that he killed the victim. Pursuant to the codefendant's testimony the trial court found that Ring killed the victim, that Ring was a major participant, and that Ring exhibited a reckless disregard for human life. Based on these findings, the trial judge sentenced Ring to death. The United States Supreme Court held: "Because Arizona's enumerated aggravating factors operate as `the functional equivalent of an element of a greater offense,' Apprendi, 530 U.S., at 494, n. 19, 120 S.Ct. 2348, the Sixth Amendment requires that they be found by a jury." 536 U.S. at 609, 122 S.Ct. at 2443. The Court did not answer whether any error could be harmless because the aggravating circumstance in Ring  murder for pecuniary gain  was implied by the jury's verdict finding Ring guilty of felony murder. The Supreme Court left it to the individual states to make that determination. 536 U.S. at 609 n. 7, 122 S.Ct. at 2443 n. 7.
After Ring was released we requested that all parties to this appeal brief the applicability of its holding to this case. The parties have filed supplemental briefs with this Court.[12]
Turner argues that, "In this case, the death sentence cannot be affirmed because a jury never made either of the fact findings necessary to support the imposition of the death penalty." Turner also argues that the Supreme Court's decision in Ring invalidates a judge's setting a convicted capital offender's sentence at death.
*785 The State presents several arguments in its supplemental briefs. The State first argues that Ring does not apply to this case because Turner waived his right to a sentencing hearing before a jury. Second, the State argues that even if Ring does apply, there is no error because a jury convicted Turner of capital murder; therefore, the maximum punishment he faced was death. Third, the State asserts that a jury convicted Turner of two capital offenses that had corresponding aggravating circumstances; therefore, there was a finding by a jury on two aggravating circumstances. Fourth, the State argues that one of the aggravating circumstances found by the trial court was that Turner had previously been convicted of a crime of violence and, the State argues, prior convictions are exempt from the Ring and Apprendi holdings.
We agree that in this case, the jury's verdict finding Turner guilty of two counts of capital murder  murder during a rape and murder during a robbery  also established that a jury had found two aggravating circumstances contained in § 13A-5-49  rape and robbery. As § 13A-5-45(e), Ala.Code 1975, specifically provides:
"(e) At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."[13]
We also agree with the State's argument that the Supreme Court's decision in Ring did not invalidate Alabama's law that vests the ultimate sentence determination in the hands of the trial judge and not a jury. As the Ring Court specifically stated in a footnote in its majority opinion:
"Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. See Apprendi v. New Jersey, 530 U.S. 466, 490-91, n. 16, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (noting `the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation' (citation omitted)). Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. See Proffitt v. Florida, *786 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion) (`[I]t has never [been] suggested that jury sentencing is constitutionally required.'). He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See Clemons v. Mississippi, 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See Apprendi, 530 U.S., at 477, n. 3, 120 S.Ct. 2348 (Fourteenth Amendment `has not . . . been construed to include the Fifth Amendment right to "presentment or indictment of a Grand Jury"')."
536 U.S. at 597 n. 4, 122 S.Ct. at 2437 n. 4 (emphasis added).
We question the State's fourth argument because in its original brief to this Court the State conceded that the trial court erroneously used Turner's Kentucky conviction of second-degree assault to establish the aggravating circumstance of a prior felony conviction for a crime of violence. (See our discussion in Part XX.C. of this opinion.)
Therefore, we are left with one aggravating circumstance that was not presented to a jury  whether the murder was especially heinous, atrocious, or cruel as compared to other capital murders. The State urges this Court to find that because two aggravating circumstances had already been found by a jury, Turner was eligible to be sentenced to death and his sentence could not be increased because the trial court found another aggravating circumstance. The State argues in its supplemental brief:
"The rule of Apprendi and Ring is that defendants are `entitled to a jury determination of any fact on which the legislature conditions an increase in their punishment.' Ring, 122 S.Ct. at 2432; accord Apprendi, 530 U.S. at 483. When a defendant is already eligible for the death penalty, no subsequent finding or evaluation of fact can possibly increase his sentence, for the obvious reason that there is no penalty greater than death. The judge and jury may subsequently find different aggravating and mitigating circumstances to exist, or they may reach different conclusions when evaluating the aggravating and mitigating circumstances. Under Apprendi and Ring, these possibilities are constitutionally irrelevant, because they do not increase the maximum sentence that the defendant may suffer."
(State's supplemental brief, p. 12.) We agree with the State's assertions.
In this case, Turner waived his sentencing hearing before a jury. The trial court found four aggravating circumstances present in the case: that the murder was committed by a person who had previously been convicted of a felony involving the use of force; that the murder was committed during the course of a rape; that the murder was committed during the course of a robbery; and that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. We do not know what evidence the trial court found to be mitigating because the trial court's findings are unclear as to both the statutory and the nonstatutory mitigating circumstances.
The trial court's sentencing order reads as follows:
"The State of Alabama has given notice of intent to assert the following aggravating circumstances pursuant to Code of Alabama, 1975, § 13A-5-49:
"1. The defendant was previously convicted of a felony involving the use or threat of violence to the person. Alabama Code § 13A-5-49(2).

*787 "2. The capital offense was committed while the defendant was engaged or was an accomplice in the commission of rape. Alabama Code § 13A-5-49(4).
"3. The capital offense was committed while the defendant was engaged or was an accomplice in the commission of robbery. Alabama Code § 13A-5-49(4).
"4. The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. Alabama Code § 13A-5-49(8).
"(1) The defendant was previously convicted of a felony involving the use or threat of violence to the person.

"The presentence investigation reveals that the defendant had a prior arrest on February 23, 1996, for Assault, 1st, and Theft by unlawful taking, and that the defendant subsequently pled guilty to Assault, 2nd, and received a seven (7) year prison sentence. The Court has received this day into evidence a certified copy of the August 30, 1996, Jefferson Circuit Court conviction of assault, 2nd, and verification of a seven (7) year prison sentence. This Court determines that the State has proved beyond a reasonable doubt the existence of the aggravating circumstance herein.
"(2) The capital offense was committed while the defendant was engaged or was an accomplice in the commission of rape.

"The jury herein returned a finding of guilt as to this aggravating circumstance. This Court determines that the State has proved beyond a reasonable doubt the existence of the aggravating circumstance herein.
"(3) The capital offense was committed while the defendant was engaged or was an accomplice in the commission of a robbery.

"The jury herein returned a finding of guilt as to this aggravating circumstance. This Court determines that the State has proved beyond a reasonable doubt the existence of the aggravating circumstance herein.
"(4) The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.

"The law has provided definitions for the terms heinous, atrocious or cruel as compared to other capital offense. The term heinous means extremely wicked or shockingly evil. The term atrocious means outrageously wicked and violent. The term cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others. For a capital offense to be especially cruel, it must be a [conscienceless] or pitiless crime which is unnecessarily torturous to the victim. All capital offenses are heinous, atrocious, and cruel to some extent. What is intended to be included in this aggravating circumstance are those cases where the actual commission of the capital offense is accompanied by such additional acts as to set this crime apart from the norm of capital offenses. This aggravating circumstance pertains only to those cases in which the degree of heinousness, atrociousness, or cruelty exceeds that which will always exist when a capital offense is committed. Courts have given specific emphasis to the manner of the killings involved in such cases and emphasis to the pain, suffering, and fear of the victims. The facts herein showed that the defendant went to the home of the victim with the specific intent to commit a crime. The use of force and fear were very present from the evidence. Darryl Turner, the defendant, in his interview with Officer Heath Emerson relayed that the victim begged the *788 defendants to cease their behavior. There was evidence of defensive knife wounds on both hands of the victim. The victim was gagged, suffocated to death, raped and left lying nude on her bed. This was committed while the victim's two-year-old grandchild was in the house and left there as the defendant stole the television and automobile and left the scene. This Court determines that the State has proved beyond a reasonable doubt the existence of the aggravating circumstance herein.
"This Court is required to enter specific findings concerning the existence or nonexistence of each mitigating circumstance enumerated by statute.
"(1) Testimony from family of the defendant.

"The Court heard testimony from the defendant's grandfather, David Coleman, who resides in Athens, Alabama. Mr. Coleman indicated that the defendant was a nice boy growing up, that he grew up in Louisville, Kentucky, and spent summers here in Athens with him. He indicated that the defendant had been taught respect, that he was not a problem child to his knowledge. He further indicated that he was shocked with the news of this specific charge against the defendant.
"The Court further heard testimony from the mother of the defendant, Beverly Marie Turner. Ms. Turner resides in Louisville, Kentucky, and indicated that her son had been a nice and quiet child growing up and had been respectful. She further indicated that this criminal charge was very uncharacteristic of the defendant. She further indicated the strong desire that the Court spare the life of her son. This Court accepts this mitigating circumstance as proven and as testified to by the witness.
"(2) Testimony from the Defendant, Darryl D. Turner.

"The Court heard testimony from the defendant; he urged this Court to grant a sentence of life without parole. The defendant further denied that he raped the victim or had anything to do with the death of the victim. The defendant did express remorse.
"(3) The defendant's age.

"This defendant was 21 years of age at the time of the offense.
"(4) The defendant has no significant history of prior criminal activity.

"This Court determines that the defendant has a prior assault, 2nd, conviction as enumerated above in Louisville, Kentucky, and a charge for possession of marijuana, 2nd, and disorderly conduct. Said arrest 2/23/96.
"(5) The disparity and criminal treatment of the codefendants.

"Defense argues that the evidence against the other codefendants is much more limited and that they will likely be treated less severely than Darryl D. Turner. There is no evidence of that and this Court does not consider that conjecture as a proving mitigating circumstance.[14]
"(6) The defendant's cooperation with authorities.

"The evidence showed that the defendant hid out in a closet and further failed to cooperate in meeting with law *789 enforcement at a scheduled time arranged between the defendant's mother and law enforcement officers in Athens. The defendant was later apprehended in Louisville, Kentucky.
"(7) The defendant is now a Christian.

"The Court has carefully considered the testimony from the mother and the defendant regarding the defendant's faith at the present time."
(C.R. 235-39.) Turner raises the following arguments concerning the trial court's sentencing order.

A.
Initially, Turner argues that this case should be remanded to the circuit court for that court to make specific findings of facts concerning the aggravating and the mitigating circumstances enumerated in the applicable statutes. Section 13A-5-47(d), Ala.Code 1975, provides:
"(d) Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the presentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52. The trial court shall also enter written findings of facts summarizing the crime and the defendant's participation in it."
(Emphasis added.) The State concedes that the trial court failed to comply with § 13A-5-47(d), Ala.Code 1975, and that a remand is necessary in order for the trial court to comply with the law.
In relation to the statutory aggravating and mitigating circumstances, we note that the trial court failed to make findings concerning the existence or nonexistence of each circumstance enumerated in § 13A-5-49 and § 13A-5-51.
Also, the trial court made the following finding about the defendant's age, "This defendant was 21 years of age at the time of the offense." (C.R. 238.) However, the trial court failed to state whether it found the defendant's age to be a mitigating circumstance.
This case is remanded to the circuit court for that court to comply with § 13A-5-47(d), Ala.Code 1975.

B.
Turner next argues that the trial court erred in considering an element of the capital offense as an aggravating circumstance. This practice, known as "double-counting," has consistently been upheld. As the Alabama Supreme Court has stated:
"`The practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as "double-counting" or "overlap" and is constitutionally permissible. Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); Ritter v. Thigpen, 828 F.2d 662 (11th Cir.1987); Ex parte Ford, 515 So.2d 48 (Ala.1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
"`Moreover, our statutes allow "double-counting" or "overlap" and provide that the jury, by its verdict of guilty of the capital offense, finds the aggravating circumstance encompassed in the indictment to exist beyond a reasonable doubt. See §§ 13A-5-45(e) and -50.

*790 "The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence." § 13A-5-50.'
"Coral v. State, 628 So.2d 954, 965-66 (Ala.Cr.App.1992). See also Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993)."
Ex parte Windsor, 683 So.2d 1042, 1060 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997).
Furthermore, application of an element of the offense as an aggravating circumstance is specifically provided for in § 13A-5-50. This section reads:
"The fact that a particular capital offense defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence. By way of illustration and not limitation, the aggravating circumstance specified in Section 13A-5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offense defined in subdivisions (1) through (4) of subsection (a) of Section 13A-5-40."
Turner also argues that the trial court violated his constitutional rights by considering robbery and rape, the underlying offenses making the murder capital, as two separate aggravating circumstances. As we stated in Hodges v. State, 856 So.2d 875, 889 (Ala.Crim.App.2001), "If the actions committed during the course of the murder support the finding that more then one of the enumerated underlying felonies was committed, then a trial court may apply § 13A-5-49(4) more than once." Citing Stewart v. State, 730 So.2d 1203 (Ala.Crim.App.1997), aff'd, 730 So.2d 1246 (Ala.1999).
The circumstances surrounding the victim's murder support applying both robbery and rape as two separate aggravating circumstances.

C.
Turner next argues that the trial court erroneously considered his prior assault conviction in Kentucky to establish the aggravating circumstance under § 13A-5-49(2)  a prior conviction of a felony involving the use or threat of violence. He further asserts that the trial court erred by using this conviction to negate the mitigating circumstance of no significant history of prior criminal conduct  § 13A-5-51(a).
In its brief to this Court, the State concedes that the trial court erred in relying on this prior conviction because the conviction was entered pursuant to a nolo contendere plea. The State cites our ruling in McNair v. State, 653 So.2d 320 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995), that a nolo contendere plea cannot be used to establish the aggravating circumstance contained in § 13A-5-49(2).
A review of the record reveals that at the sentencing hearing the State introduced a certified copy of a Kentucky guilty-plea conviction for assault in the second degree. The certified copy states that the plea was entered pursuant to North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). The State concedes that the Kentucky conviction was unlawfully used in considering both the aggravating and the mitigating *791 circumstances because it was based on a nolo contendere plea.
While reviewing the trial court's findings on the application of the mitigating circumstance that the defendant had no significant history of prior criminal activity we became aware that the trial court used arrests to negate the application of this mitigating circumstance. It was error for the trial court to use mere arrests to negate this circumstance. We direct the trial court's attention to our holding in Hodges v. State, 856 So.2d 875, 892 (Ala. Crim.App.2001), where we stated, "Only convictions can negate the consideration of [the § 13A-5-51(a)] mitigating circumstance."

D.
Turner further argues that the trial court erred in failing to find his age,[15] his cooperation with authorities, and the disparity in treatment between him and his codefendants as nonstatutory mitigating circumstances.
Turner never raised this issue in the trial court; therefore, we are limited to a plain-error analysis. See Rule 45A, Ala. R.App.P.
"`"While Lockett [v. Ohio, 438 U.S. 586 (1978),] and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority."'" Maples v. State, 758 So.2d 1, 33 (Ala.Crim.App.), aff'd, 758 So.2d 81 (Ala.1999), cert. denied, 531 U.S. 830, 121 S.Ct. 83, 148 L.Ed.2d 45 (2000), quoting Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996).
There was absolutely no evidence presented during Turner's trial indicating that his codefendants were treated differently than Turner.[16] This is because one of Turner's codefendant's, Christopher Harris, was not tried until after Turner was tried, convicted, and sentenced to death.
Turner argues that according to the Alabama Supreme Court's decisions in Ex parte McWhorter, 781 So.2d 330 (Ala. 2000), and Ex parte Burgess, 811 So.2d 617 (Ala.2000), we should direct the trial court to consider as a nonstatutory mitigating circumstance the disproportionate treatment his codefendants may have received. We do not agree.
In Burgess, the Alabama Supreme Court directed the trial court to place greater weight on the lenient treatment that Burgess's codefendants had received because Burgess was the only participant in the shooting who was prosecuted and two others had admitted their involvement. The Supreme Court stated, "Given the fact that the defendant was the only one of six participants in this offense who was prosecuted, we conclude that the trial court should have given this factor greater weight." 811 So.2d at 628.
In McWhorter, the Supreme Court distinguished Burgess, and held that McWhorter's sentence was not disproportionate because his codefendants's involvement *792 in the murder was not as great as McWhorter's. The Supreme Court stated:
"The law does not require that each person involved in a crime receive the same sentence. Wright v. State, 494 So.2d 726, 739 (Ala.Crim.App.1985) (quoting Williams v. Illinois, 399 U.S. 235, 243, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970)). Appellate courts should `examine the penalty imposed upon the defendant in relation to that imposed upon his accomplices, if any.' Beck v. State, 396 So.2d 645, 664 (Ala.1980). However, the sentences received by codefendants are not controlling per se, Hamm v. State, 564 So.2d 453, 464 (Ala.Crim.App.1989), and this Court has not required or directed that every person implicated in a crime receive the same punishment. Williams v. State, 461 So.2d 834, 849 (Ala.Crim.App.1983), rev'd on other grounds, 461 So.2d 852 (Ala.1984). `"There is not a simplistic rule that a codefendant may not be sentenced to death when another co-defendant receives a lesser sentence."' Id. (quoting Collins v. State, 243 Ga. 291, 253 S.E.2d 729 (1979))."
781 So.2d at 344.
Here, the evidence showed that Turner was the instigator of the events that occurred on February 21, 1996. Also, Turner was the only one of the three who took any items from the victim's home. He was seen driving the victim's Cadillac and he pawned the victim's television set. Moreover, the DNA tests conducted on the sperm excluded the codefendants as the source but did not exclude Turner. There was no plain error in the trial court's failure to find the treatment of the codefendants as a mitigating circumstance.

E.
Turner last argues that the trial court erred in finding that the murder was especially heinous, atrocious, or cruel as compared to other capital murders.
The trial court's findings on this aggravating circumstance are detailed above; we will not recite them here. This Court in McNair, supra, stated:
"`In Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), th[e Alabama Supreme] Court held that the standard applicable to the "especially heinous, atrocious, or cruel" aggravating circumstance under § 13A-5-49(8) is that for a crime to fit within that section it must be one of "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim."' Ex parte Bankhead, 585 So.2d 112, 124 (Ala.1991). See also Bui v. State, 551 So.2d 1094, 1119-20 (Ala.Cr.App.[1988]), affirmed, 551 So.2d 1125 (Ala.1989), vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991). `Since the 1981 case of Kyzer . . ., the Alabama appellate courts have confined the application of the "heinous, atrocious or cruel" aggravating factor to "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim."' Lindsey v. Thigpen, 875 F.2d 1509, 1514 (11th Cir.1989)."
653 So.2d at 346.
Clearly, the murder was especially heinous, atrocious, or cruel as compared to other capital offenses, by any reasonable definition. However, we question the trial court's findings on this aggravating circumstance.
We recognize that the trial court's order sets out the applicable law in regard to a finding that the murder was especially heinous, atrocious, or cruel. See Ex parte Kyzer, 399 So.2d 330 (Ala.1981). However, the trial court stated very few facts in support of its finding. On remand, we direct the trial court to expand on its *793 findings in regards to this aggravating circumstance. Specifically, we direct the trial court to state facts concerning the prolonged suffering, pain, and torture inflicted on the victim. See Barksdale v. State, 788 So.2d 898 (Ala.Crim.App.2000).
For the reasons detailed above, this case is due to be, and is hereby, remanded to the circuit court of Limestone County for that court to vacate Turner's convictions and sentences for robbery, theft, and rape as discussed in Part XVII of this opinion. This case is further remanded for the trial court to correct the deficiencies in its sentencing order discussed in Part XX of this opinion. The trial court is directed to comply with § 13A-5-47(d), Ala.Code 1975, to not consider Turner's Kentucky conviction for any purpose, to not consider arrests to negate the mitigating circumstance of no significant record of prior criminal activity, under § 13A-5-51(a), and to tailor its findings concerning the aggravating circumstance of especially heinous, atrocious, or cruel as compared to other capital murders. Due return should be filed in this Court no later than 70 days from the date of this opinion.

REMANDED WITH DIRECTIONS.
McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.

On Return to Remand
WISE, Judge.
The appellant, Darryl D. Turner, was convicted of two counts of capital murder for murdering Barbara Wilson during the course of a rape and a robbery. See §§ 13A-5-40(a)(3) and 13A-5-40(a)(2), Ala. Code 1975. Turner was also convicted of robbery, theft, burglary, and rape. We remanded this case so that the trial court could vacate the convictions for robbery, theft, and rape, because those convictions were encompassed in the greater capital offenses. This Court further directed the trial court to correct certain omissions and deficiencies in its sentencing order. See Turner v. State, 924 So.2d 737 (Ala.Crim. App.2002). The trial court has, in part, complied with our directions and has set aside the robbery, theft, and rape convictions and has corrected many of the cited deficiencies in its sentencing order.

I.
We first directed the trial court that it could not consider a prior conviction of assault based on a nolo contendere plea to establish the aggravating circumstance contained in § 13A-5-49(2)  a prior history of criminal activity. The trial court has complied with our directions and has made the following findings concerning this aggravating circumstance:
"The pre-sentence investigation reveals that the defendant had a prior arrest on February 23, 1996, for Assault, 1st, and Theft by Unlawful Taking, and that the defendant subsequently pled guilty to Assault, 2nd, and received a seven (7) year prison sentence. The Court has received into evidence a certified copy of the August 30, 1996, Jefferson Circuit Court conviction of Assault, 2nd, and verification of a seven (7) year prison sentence. This conviction was entered pursuant to a nolo contendere plea. A nolo contendere plea can not be used to establish the aggravating circumstance contained in § 13A-5-49(2), McNair v. State, 653 So.2d 320 (Ala. Crim.App.1992), affirmed, 653 So.2d 353 (Ala.1994).
"This Court determines that the State has not proven beyond a reasonable doubt the existence of this aggravating circumstance."
Also, in regards to the nolo contendere plea, we stated that the trial court could not consider the nolo contendere plea *794 when determining whether the mitigating circumstance of no significant history of prior criminal activity was present. The trial court has complied with our directions and has made the following finding:
"A nolo contendere plea can not be used to establish the aggravating circumstance contained in § 13A-5-49(2), [Ala.Code 1975;] McNair v. State, 653 So.2d 320 (Ala.Crim.App.1992), affirmed 653 So.2d 353 (Ala.1994). It is the finding of this Court that the defendant has no significant history of prior criminal activity, and this is proven to be a mitigating circumstance herein."

II.
We further directed the trial court to make more detailed findings of fact concerning the aggravating circumstance that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. The trial court has complied with our directions; it amended its sentencing order to state:
"The law has provided definitions for the terms heinous, atrocious or cruel as compared to other capital offenses. The term heinous means extremely wicked or shockingly evil. The term atrocious means outrageously wicked and violent. The term cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others. For a capital offense to be especially cruel, it must be a [conscienceless] or pitiless crime which is unnecessarily tortuous to the victim. All capital offenses are heinous, atrocious and cruel to some extent. What is intended to be included in this aggravating circumstance are those cases where the actual commission of the capital offense is accompanied by such additional acts as to set this crime apart from the norm of capital offenses. This aggravating circumstance pertains only to those cases in which the degree of heinousness, atrociousness or cruelty exceeds that which will always exist when a capital offense is committed. Courts have given specific emphasis to the manner of the killings involved in such cases and emphasis to the pain, suffering and fear of the victims.
"The facts herein would show that the victim, Barbara Wilson, was babysitting her grandchild on February 21, 1996. The victim, at this time, lived with L.T. Southard. Greg Coleman, the defendant's uncle and roommate, was a co-worker with Southard at Stinnett Construction. Southard and Coleman were called away for work in the early morning hours of February 21, 1996. This Defendant, Darryl D. Turner, developed the idea and plan to go to the victim's home along with two codefendants to engage in a theft and robbery (`to get a lick') as described by Turner and a witness who had been solicited to help Turner that morning. Darryl Turner knew that Southard would not be in the victim's home on the day in question since he left with Greg Coleman to go to Birmingham to work. There is evidence that Turner recruited the two codefendants to accomplish these crimes. Turner went with the two codefendants to accomplish these crimes. Turner went with the two codefendants to the Wilson home and was actively involved or aided and abetted in the commission of the crimes herein. The victim was found murdered and lying nude on a bed, not in her own bedroom. The victim had been tied up with a phone cord jerked from the wall telephone, gagged and suffocated to death by the use of a pillow over the face of the victim. The victim had also been raped. DNA evidence clearly excluded L.T. Southard and the other two codefendants as the potential *795 sources for the sperm found in the vagina of the victim, Barbara Ann Wilson. DNA evidence and testimony could not exclude the Defendant, Darryl D. Turner, as the source for said sperm. A knife was found lying on a bedside table close to the victim. The victim had defensive type wounds on her hands. Blood was discovered at the scene of the murder which matched the victim's. The condition of the body showed that the victim was clearly not a willing participant to the events that ultimately led to her death.
"All of these heinous, cruel and inhuman activities occurred while the victim was babysitting her two-year-old grandchild. This grandchild was left unattended and found wandering in the area the next day. The Defendant, Darryl D. Turner, confessed to the police that he was involved in Wilson's murder. A 19-inch television and a 1993 Cadillac automobile were stolen from the victim. A witness in the trial, Travaris McCurley, testified that he was recruited to be an accomplice in this crime. McCurley testified that later in that day Turner came back to the house and told him to look out the window. McCurley looked out and saw Wilson's (the victim) Cadillac parked in front of the house. McCurley testified that Turner told him that he had `killed the bitch.' He told McCurley that he had killed her because he did not want her to tell police what they had done. The defendant was the only one of the three codefendants that took anything of value from the victim. Turner was seen in the victim's car and he personally pawned the victim's television. Turner's actions, both before and after the crime, showed that he was an active participant in said crime. Following the defendant pawning the television in Athens, Alabama, he drove the Cadillac to Louisville, Kentucky, where he was later apprehended.
"It is the finding of this Court that the use of force and an obvious fear from the victim were very present and obvious from all the evidence. Darryl D. Turner, the defendant, in his interview with Officer Heath Emerson related how the victim had begged the defendants to cease their behavior. There was evidence of defensive type knife wounds on both hands of the victim. The victim was gagged, suffocated to death, raped and left lying on her bed. All this was committed while the victim's two year old grandchild was present in the house. The child was left there as this defendant stole the victim's television and automobile."
We have held that this aggravating circumstance may lawfully be applied if psychological or physical torture were inflicted on the victim. See Hodges v. State, 856 So.2d 875, 894 (Ala.Crim.App. 2001) (opinion on return to remand). Factors that tend to prove this aggravating circumstance include: (1) physical violence beyond that necessary to cause death; (2) appreciable suffering after the assault; and (3) psychological torture. Norris v. State, 793 So.2d 847 (Ala.Crim.App.1999).
Here, the above facts clearly show that the murder was especially heinous, atrocious, or cruel when compared to other capital murders. Not only was the victim subjected to great physical suffering but she was subjected to great psychological suffering as well. Certainly, the victim was aware that her death was imminent and she feared not only for her life but for the life of her grandchild. We agree that this aggravating circumstance was correctly applied in this case.

III.
We further directed the trial court to state whether it had found that Turner's *796 age was a mitigating circumstance. The trial court stated:
"This defendant was twenty-one years of age at the time of the offense. The Court does not find the defendant's age to be a mitigating circumstance in this case."

IV.
To a great extent the trial court complied with our directions; however, it is necessary to again remand this case so that the trial court can comply with § 13A-5-47(d), Ala.Code 1975, by making specific findings as to the applicability or nonapplicability of every statutory aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, every mitigating circumstance enumerated in § 13A-5-51, Ala. Code 1975, and any nonstatutory mitigating circumstances that it found were present in the case. Section 13A-5-47(d), states, in part:
"(d) Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the presentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52."
The trial court's order is deficient because it fails to specifically state each and every aggravating and mitigating circumstance enumerated in the above statutes  whether or not it found those circumstances to apply to the present case. Moreover, though the nonstatutory mitigating circumstances the trial court considered are detailed in the order, the organization of the trial court's order makes it appear that the court considered those nonstatutory mitigating circumstances as statutory mitigating circumstances. These discrepancies must be corrected before we can proceed any further with this appeal.
Therefore, it is necessary to again remand this case to the Circuit Court of Limestone County for that court to correct its sentencing order to comply with § 13A-5-47(d), Ala.Code 1975. The trial court is further directed to reweigh the aggravating and the mitigating circumstances once it has complied with the directions in this opinion. Due return should be filed in this Court no later than 42 days from the date of this opinion.
REMANDED WITH DIRECTIONS.
McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.

On Return to Second Remand
WISE, Judge.
The appellant, Darryl D. Turner, was convicted of two counts of capital murder for murdering Barbara Wilson during the course of a rape and a robbery. See §§ 13A-5-40(a)(3) and 13A-5-40(a)(2), Ala. Code 1975. Turner was also convicted of robbery, theft, burglary, and rape. We affirmed Turner's convictions for capital murder but remanded this case for the trial court to vacate the robbery, theft, and rape convictions, because they were encompassed in the convictions for the greater offenses of capital murder. We also directed the trial court to correct certain deficiencies in its sentencing order. See Turner v. State, 924 So.2d 737, 783 (Ala. Crim.App.2002). We then remanded this case for a second time for the trial court to comply with § 13A-5-47(d), Ala.Code 1975, by making specific findings as to the applicability or nonapplicability of all of the statutory aggravating and mitigating circumstances and the nonstatutory mitigating *797 evidence it found to exist in the case. See Turner v. State, 924 So.2d 737, 793 (opinion on return to remand). The trial court has complied with our directions. We now address the propriety of Turner's convictions and sentence to death.
Turner was convicted of two counts of murder made capital because Barbara Wilson was murdered during a robbery and a rape. See §§ 13A-5-40(a)(3) and 13A-5-40(a)(2), Ala.Code 1975.
The record shows that Turner's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. § 13A-5-53(b)(1), Ala. Code 1975.
The trial court found the following aggravating circumstances: that the murder was committed during a rape; that the murder was committed during a robbery; and that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. We have previously addressed and upheld the application of each of these aggravating circumstances. See our opinion on return to remand in this case. 924 So.2d at 793. The trial court found as a statutory mitigating circumstance that Turner had no significant history of prior criminal activity. The trial court found the following nonstatutory mitigating circumstances to exist:
"The Court heard testimony from the defendant's grandfather, David Coleman, who resides in Athens, Alabama. Mr. Coleman indicated that the defendant was a nice boy growing up, that he grew up in Louisville, Kentucky, and spent summers here in Athens with him. He indicated that the defendant had been taught respect and that he was not a problem growing up. He further indicated that he was shocked with the news of this specific charge against the defendant.
"The Court further heard testimony from the mother of the defendant, Beverly Marie Turner. Ms. Turner resides in Louisville, Kentucky, and indicated that her son had been a nice and quiet child growing up and had been respectful. She further indicated that this criminal charge was very uncharacteristic of the defendant. She indicated the strong desire that the Court spare the life of her son. This Court finds this mitigating circumstance as proven and as testified to by the witnesses."
We agree with the trial court's findings. However, as required by § 13A-5-53(b)(2), Ala.Code 1975, this Court must independently weigh the aggravating circumstances and the mitigating circumstances to determine the propriety of Turner's death sentence. After an independent weighing, we are convinced, as was the trial court, that death is the appropriate sentence in this case.
Section 13A-5-53(b)(3), Ala.Code 1975, also requires that we address whether Turner's sentence was disproportionate or excessive when compared to the punishment imposed in similar capital cases. Turner raped and killed Barbara Wilson in a vicious manner while her two-year-old granddaughter was in the house. He then stole her television and her automobile. Turner's sentence is neither disproportionate or excessive when compared to the sentences imposed in similar cases. See Ex parte Roberts, 735 So.2d 1270 (Ala. 1999) (robbery-murder); Baldwin v. State, 456 So.2d 117 (Ala.Crim.App.1983), aff'd, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985) (robbery-murder); Bell v. State, 475 So.2d 601 (Ala.Crim.App.1984), aff'd, 475 So.2d *798 609 (Ala.1985) (robbery-murder); Freeman v. State, 555 So.2d 196 (Ala.Crim. App.1988), aff'd, 555 So.2d 215 (Ala.1989) (rape-murder); Bradley v. State, 494 So.2d 750 (Ala.Crim.App.1985), aff'd, 494 So.2d 772 (Ala.1986) (rape-murder).
Last, we have searched the entire record for any error that may have adversely affected Turner's substantial rights and have found none. See Rule 45A, Ala. R.App.P.
Turner's death sentence is due to be, and is hereby, affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.
NOTES
[1] Christopher G. Harris was also indicted for capital murder for the murder of Wilson but was convicted of the lesser offenses of felony murder, robbery, and burglary. On appeal, we affirmed his convictions for felony murder and burglary but ordered the trial court to vacate his robbery conviction because it was encompassed in the felony murder charge. See Harris v. State, 854 So.2d 145 (Ala.Crim. App.2002).

The presentence report in Turner's case states that Trent Rainey was also indicted for capital murder. At the time of Turner's trial the charges against Rainey were still pending.
[2] Although it is common to remove potential jurors from jury service outside the presence of the parties under § 12-16-63, Ala.Code 1975, here the potential jurors were excused in the presence of all parties and counsel. (R. 91.)
[3] Batson has been extended to include strikes of Hispanic prospective jurors. See Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), and Wilsher v. State, 611 So.2d 1175 (Ala.Crim.App.1992).
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] "DNA population frequency statistical evidence concerns the frequency with which a given DNA pattern might occur in a given population." Turner, 746 So.2d at 357 (footnote omitted).
[6] PCR is an acronym for polymerase chain reaction. "There are three subtypes of PCR testing: DQ Alpha, which tests a single genetic marker; Polymarker, which tests five genetic markers; and the Short Tandem Repeat (STR) which tests three or more genetic markers." Lemour v. State, 802 So.2d 402, 405 n. 5 (Fla.Dist.Ct.App.2001), review denied, 821 So.2d 297 (Fla.2002).
[7] On appeal, Turner does not challenge the admission of the DNA evidence concerning the blood on the knife.
[8] "DNA population frequency statistical evidence concerns the frequency with which a given DNA pattern might occur in a given population." Turner, 746 So.2d at 357 (footnote omitted).
[9] A mixed sample is a sample that includes more than one person's DNA, e.g., a suspect and a victim.
[10] Dr. Morrison testified on cross-examination, "I can give you some frequency calculations on that, if you like." (R. 556.)
[11] In Poole v. State, 846 So.2d 370 (Ala.Crim. App.2001), we addressed the application of Apprendi to § 13A-12-250 and § 13A-12-270, Ala.Code 1975, which mandate an increase of five years in a sentence for a drug-sale conviction if the sale occurred within three miles of a school or a housing project. We held that Apprendi issues had to be preserved for this Court to review the issue on appeal. We also held that the finding that increased the sentence above the statutory maximum did not have to be alleged in the indictment. The Alabama Supreme Court recently adopted this Court's holding in Poole. Hale v. State, 848 So.2d 224 (Ala.2002).
[12] One week before Ring was released, the United States Supreme Court released its decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). The Atkins court held that it was a violation of the Eighth Amendment of the United States Constitution to execute a mentally retarded individual. The record here does not reflect that Turner was mentally impaired. The presentence report states, "Darryl Dewayne Turner claims to be in good health and denies addictions, disabilities, and mental problems." (Supplemental Record p. 10.) Moreover, Turner prepared and read a statement at his sentencing hearing. Turner appeared to be educated and reasonably articulate. The record fails to disclose any evidence that Turner is mentally impaired.
[13] Indiana, which has a capital murder statutory scheme similar to Alabama's, recently addressed this issue. The Supreme Court of Indiana in Wrinkles v. State, 776 N.E.2d 905, 907 (Ind.2002), stated:

"The Court need not decide whether Ring applies retroactively or whether some aspects of Indiana's death penalty scheme are affected by Ring, because Ring is not implicated in petitioner's case under any view that the Court might find plausible. The aggravating circumstance that made petitioner eligible for a death sentence was that he had committed multiple murders. See I.C. § 35-50-2-9(b)(8). The jury's verdict in the guilt phase, finding petitioner guilty of the three murders, necessarily means that the jury found, beyond a reasonable doubt, that petitioner had committed more than one murder."
[14] The presentence report indicates that both of Turner's codefendants were indicted for capital murder and various other charges arising out of the events that occurred on February 21, 1996. The presentence report further indicates that when the report was prepared, immediately before the trial court's sentencing hearing, the charges against the codefendants were pending.
[15] In an earlier portion of this opinion, we directed the trial court to specifically state whether it found Turner's age to be a statutory mitigating circumstance.
[16] This Court can take judicial notice of our own records. This Court recently considered an appeal by one of Turner's codefendants, Christopher G. Harris, from his convictions for felony murder, robbery, and burglary. See Harris v. State, 854 So.2d 145 (Ala.Crim. App.2002).

However, the only evidence before the trial court was the information contained in the presentence report that both Harris and Rainey had been indicted for capital murder and that the charges were currently pending.